IN THE SUPREME COURT OF TENNESSEE
AT JACKSON[1]
June 1, 2017 Session

## STATE OF TENNESSEE v. TABITHA GENTRY (AKA ABKA RE BAY)

**Appeal by Permission from the Court of Appeals**
**Shelby County Criminal Court**
**No. 13-02671          Hon. James M. Lammey, Judge**

_____

**No. W2015-01745-SC-R11-CD**

_____

The primary issue in this appeal is whether Tennessee's theft statute, Tennessee Code Annotated section 39-14-103, encompasses theft of real property. The defendant physically entered and occupied for over a week a vacant East Memphis house valued at more than two million dollars and filed documents with the Shelby County Register of Deeds Office purporting to reflect her ownership of the property. A jury convicted the defendant of theft of property valued at over $250,000 and aggravated burglary. The defendant challenges her convictions, arguing that Tennessee's theft statute does not encompass theft of real property. We conclude that our theft statute applies to theft of real property by occupation, seizure, and the filing of a deed to the property and that the evidence is sufficient to support the defendant's convictions. We also reject the defendant's arguments that the trial court improperly limited her cross-examination of a prosecution witness and her closing argument. Accordingly, we affirm the judgment of the Court of Criminal Appeals upholding the defendant's convictions and remanding to the trial court for resentencing.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed; Case Remanded to the Trial Court for Resentencing**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., and SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Tabitha Gentry, a/k/a, Abka Re Bay.

---

[1] Oral argument was heard on the campus of Lipscomb University in Nashville, Davidson County, Tennessee, as part of the American Legion Auxiliary Volunteer Girls State S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Herbert H. Slatery III, Attorney General and Reporter, Jeffrey D. Zentner, Assistant Attorney General, Amy P. Weirich, District Attorney General; Byron Winsett and Samuel D. Winnig, Assistant District Attorneys General, for the appellee, State of Tennessee.


# OPINION

## I. Factual and Procedural Background

The defendant, Tabitha Gentry ("Defendant"), was indicted by a Shelby County Grand Jury for theft of property valued at over $250,000 and aggravated burglary. These charges stemmed from Defendant's seizure and physical occupation of an East Memphis home, which occurred over the course of one week at the beginning of March 2013. Defendant's jury trial occurred from April 20 to April 23, 2015. The following is a summary of the proof offered at trial.

On August 26, 2011, Renasant Bank ("Bank") foreclosed on the East Memphis home. Gregory Hadaway, an executive vice president at the Bank, assigned Greg Paule, the person in charge of managing the Bank's foreclosed homes, to prepare the home for sale. The home, situated on a three-and-a-half acre gated property, was described by various witnesses at trial as having seventeen rooms, 10,000 square feet of very nicely finished interior space, two fireplaces, a well-manicured exterior with expensive landscaping and a swimming pool, and a four-car garage. Mr. Paule, acting for the Bank, contracted with a real estate agent, John Dickens, to show the home and find a buyer. By February of 2013, Mr. Dickens had sold the home for $2.4 million dollars and scheduled the closing for later that month. The closing was rescheduled to March 29, 2013, to allow the Bank time to make repairs called for by a home inspection report.

Meanwhile, as the Bank worked to finalize the sale, Defendant worked to acquire the property without purchasing it. On February 25, 2013, Defendant filed twelve pages of difficult to decipher documents with the Shelby County Register of Deeds. The first of these documents is a January 14, 2012 letter addressed to the Bank's executives, including the Bank president, Jeff Hudson. The document is an "Affidavit of Fact" and "Cover Letter" for a mailing giving notice of Defendant's intentions as to the East Memphis home, although it is not clear that she ever sent the letter to Mr. Hudson or the other people listed as recipients. Defendant also filed a document titled "quitclaim deed" that purported to transfer title of the East Memphis home to Defendant, using Defendant's alias—Abka Re Bay.[2] Because the documents Defendant filed were so anomalous, the employee receiving them at the Register's office indexed them under

---

[2] The record is inconsistent regarding the spelling of Ms. Gentry's alias. We have chosen to use the spelling in the indictment even though the spelling that Ms. Gentry used in her filings with the county register was "Re Bey."

"miscellaneous" in the computer system and linked them with Defendant's name, rather than indexing them as a genuine transfer of ownership of the East Memphis home.

By March 4, 2013, Defendant had entered the East Memphis home without the Bank's consent or knowledge and changed the locks. She had placed a large chain and padlock on the front gate that was positioned across the driveway to the property. She also had posted six signs, advertising "No Trespassing," "Private Property," and "Keep Out" on trees around the property. On at least two of those signs, she hand wrote her name. In addition to the chain, she also placed on the gate a flag for the "Moorish National Republic," apparently with a star in the center like the Moroccan national flag, and a sign stating, "I Abka Re Bay, seize this land" for the "Moorish National Trust."

Mr. Dickens, who regularly checked on properties he was selling, discovered the signs, flag, chain, and padlock when he drove by the East Memphis home on March 4, 2013. Mr. Dickens had not given anyone permission to place the items on the property, and he had not seen them there when he had passed by the property only a couple of days earlier.

Mr. Dickens stopped to investigate and called Mr. Paule to notify him about what was happening at the home. Mr. Paule called his boss at the Bank, Mr. Hadaway, because the house was a large asset on the Bank's books. At Mr. Hadaway's direction, Mr. Paule called the police and drove to the property, where Mr. Dickens was waiting, arriving around 3 p.m. Shortly after Mr. Paule arrived, both he and Mr. Dickens saw a woman briefly leave the house and then run back inside. They saw someone peer from a window and yell something unintelligible as the woman headed towards the house. A few minutes later, they saw two younger people come out of the house for only a few seconds and then jump back inside. At about 4 p.m., the Memphis City police arrived, took pictures of the gate, and made note of the "No Trespassing" signs.

By the time the police had spoken with Mr. Dickens and Mr. Paule and prepared a written report, it was nearly dark, and the police decided not to approach the house at that time because of safety concerns. The officers told Mr. Paule to call the police the next morning to discuss the situation. Mr. Paule spoke with his boss at the Bank and the Memphis City police again the next day and the police suggested that Mr. Paule also call the FBI, which he did. The FBI declined to become involved at that time. Later, Mr. Paule and Mr. Dickens went to the Memphis police station in person. Mr. Dickens had checked on the house again that morning and noticed a white car driving up the driveway to the home. The Bank president, Mr. Hudson, had become interested in the situation and also attended the meeting at the police station where it was decided that the Bank needed to give the occupants of the home twenty-four hours' notice to vacate. Mr. Hudson, Mr. Dickens, and Mr. Paule went to the house and placed a written notice to vacate, signed by Mr. Hudson, on the gate, which read:

March 5, 2013 (2:30) p.m.

This is your formal notice to vacate this property . . . within 24 (twenty four) hours from date and time above.

You must have vacated this property by March 6th, 2013 at 2:30 p.m.

The next day, March 6th, Mr. Paule planned to go to the home and have the utilities turned off, but his plans changed after he received information from an attorney for the City of Memphis. Although the record does not contain direct testimony about their conversation, a discussion during Defendant's trial between the trial judge and counsel for both parties outside the presence of the jury suggests that Mr. Paule learned from this attorney that Defendant was under FBI investigation because of threats she had made against the President of the United States. Seemingly as a result of concerns related to those threats, the Shelby County Sheriff's Office became involved and decided to enter the house with a Special Weapons and Tactics ("SWAT") team to arrest Defendant for the home occupation.

On March 7th, Mr. Paule gave the Shelby County Sheriff's Office plans to the house in preparation for an arrest at the house. Late that night or early the next morning a SWAT team from the Sheriff's Office approached the house and waited by a wall on the back side of the property. As the SWAT team prepared to enter the property, they saw a white car leave through the front gate and radioed a command post that the car was leaving the house. Sergeant Richard Almond III, with the Sheriff's Office, received the call, followed the white car, pulled it over, and arrested Defendant, pursuant to an arrest warrant, about a quarter mile away from the entrance gate to the house. By the time of Defendant's arrest, at least three camera crews for news outlets were reporting from outside the home.[3]

The SWAT team, believing that others were inside the home, entered the property after Defendant left and attempted to open a door to the house with a key they had received from the realtor. Because Defendant had changed the locks, they could not gain entry with the key, so the SWAT team used a battering ram to break the door open. Once inside, they discovered the house was empty, so the SWAT team left.

Sergeant Brad Less, with the Sheriff's Office, searched the house pursuant to a warrant on March 7, 2013, and took photographs as he did so. He discovered that interior doors had been tied shut with ropes and belts. He found clothing, food, a few air

---

[3] Unedited footage from one news crew was entered into evidence. It showed Defendant getting out of a white car, unlocking the padlock holding the chain around the front gate, entering the driveway on the property, and replacing the chain and padlock on the gate. When the news reporter walked through the driveway entrance gate while asking Defendant questions about the home seizure, Defendant told the reporter that she could not enter because she "[was] on private property."

mattresses, official documents under the name of Tabitha Gentry, and "Moorish sovereign documents" issued to "Abka Re Bay," along with other small personal and miscellaneous items. According to the testimony of Mr. Paule, "there was not a great deal of damage" to the East Memphis home, although the door the SWAT team had battered had to be repaired, locks had to be changed, and the home had to be cleaned. Evidence and testimony at trial showed that the home sold for over $2 million on March 29, 2013, shortly after Defendant's occupation of the house, and had been appraised, for county tax purposes, at $2.75 million in 2012 and $3 million in 2013.

Defendant chose not to testify at trial, at least partly based on her belief that she was "not subject to [the] futile jurisdiction" of the trial court.[4] The jury convicted Defendant of theft of property valued at $250,000 or more, a Class A felony, and aggravated burglary, a Class C felony. The aggravated burglary conviction was based on Defendant's intent to commit the theft of the real property when she entered the same house. See Tenn. Code Ann. §§ 39-14-401 to -403 (2014 & 2017 Supp.). On May 27, 2015, the trial judge imposed a twenty-year sentence for the theft conviction and a three-year sentence for the aggravated burglary conviction and ordered these sentences served concurrently to each other but consecutively to Defendant's sentence in another case arising in Shelby County.

Defendant appealed, alleging that: (1) the evidence is insufficient to support her convictions for theft and burglary; (2) the trial court improperly limited cross-examination of a prosecution witness on the subject of adverse possession; (3) the trial court improperly prohibited Defendant from discussing adverse possession in her closing argument; and (4) the trial court erred in ordering consecutive sentencing. The Court of Criminal Appeals affirmed Defendant's convictions and sentences, reversed the trial court's ruling ordering the sentences served consecutively to the sentence imposed in another case arising in Shelby County, remanded the case for resentencing, and affirmed the trial court's judgments in all other respects. State v. Gentry, W2015-01745-CCA-R3-CD, 2016 WL 4264266 (Tenn. Crim. App. Aug. 12, 2016), perm. app. granted (Dec. 14, 2016). Defendant then filed an application for permission to appeal pursuant to Rule 11 of the Tennessee Rules of Appellate Procedure, which we granted. Because the State did not appeal the Court of Criminal Appeals' ruling on the issue of consecutive sentencing, that issue is not before us.

## II. Standards of Review

The primary issue in this appeal is whether Tennessee's consolidated theft statute encompasses the offense of theft of real property, and if so, whether theft has been committed based on the facts in this case. Statutory construction is a question of law which we review de novo and to which the following familiar rules apply. Our primary

---

[4] Even though Defendant did not testify, her statements appear in the record as occasional outbursts and direct conversations with the judge during the trial.

objective when construing statutes is to determine and carry out legislative intent without broadening or restricting statutes beyond their intended scope. State v. Pope, 427 S.W.3d 363, 368 (Tenn. 2013). The power to define criminal offenses and assess punishments for crimes is vested in the legislature. State v. Burdin, 924 S.W.2d 82, 87 (Tenn. 1996). It is not the role of this Court to substitute its own policy judgments for those of the legislature. Frazier v. State, 495 S.W.3d 246, 249 (Tenn. 2016). We always begin with the words the General Assembly has used in the statute. Thurmond v. Mid–Cumberland Infectious Disease Consultants, PLC, 433 S.W.3d 512, 517 (Tenn. 2014). When the statutory language is clear and unambiguous, we apply its plain meaning, understood in its normal and accepted usage. Id. Where statutory language or a statute's meaning is ambiguous, we determine legislative intent by considering the overall statutory scheme, the legislative history, and other sources. Id.

Familiar principles also guide our determination of whether the evidence is sufficient to support Defendant's conviction. To begin, "we examine the relevant statute(s) in order to determine the elements" of the offense that must be proven by the prosecution beyond a reasonable doubt. State v. Stephens, 521 S.W.3d 718, 723-24 (Tenn. 2017) (citing State v. Smith, 436 S.W.3d 751, 761-65 (Tenn. 2014)). Having identified the elements of the offense, we determine, "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt; thus, on appeal a defendant bears the burden of demonstrating why the evidence is insufficient to support the conviction. Id. (citing State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011)). The State is afforded the strongest legitimate view of the evidence presented at trial and any reasonable and legitimate inferences that may be drawn from the evidence. Id. (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)). "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). "This Court neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing Bland, 958 S.W.2d at 659)).

### III. Analysis

#### A. Does Tennessee's 1989 consolidated theft statute encompass theft of real property?

##### 1. The History of Theft

Prior to 1989, Tennessee did not have a single, generic definition of theft. Rather, theft offenses were contained in a number of "antiquated and confusing statutes" and included "embezzlement, false pretense, fraudulent conversion, larceny, receiving or

concealing stolen property, and shoplifting." Tenn. Code Ann. § 39-14-101 (2014 & 2017 Supp.), Sentencing Comm'n Cmnts.[5] These statutes derived from English common law, which was later applied in the American colonies and then in American states. People v. Williams, 305 P.3d 1241, 1244 (Cal. 2013) (recounting the history of theft-like crimes from their common-law roots in Britain and the United States to the early 20th century development of California's consolidated theft statute). Under the common law, larceny was the first theft-like crime. Id. at 1245. In the 18th century, by a somewhat ad-hoc process, the British Parliament created separate statutory offenses of theft by false pretenses and embezzlement. Id. at 1245-46. However, this division of theft-like crimes into separate statutory provisions was criticized as burdensome to prosecutors and arbitrary. Id. at 1246.

Following the expansion of the scope of theft offenses, the move to enact consolidated theft statutes can be traced at least as far back as 1827, when the Parliament of the United Kingdom noted that "a failure of justice frequently arises from the subtle distinction between larceny and fraud" and allowed, by statute, a conviction for larceny to stand even if a defendant was indicted for false pretenses. State v. Tower, 251 P. 401, 402-03 (Kan. 1926) (describing this as "an act consolidating and amending the laws relating to larceny and offenses connected therewith" and citing 7 & 8 Geo. IV, c. 29, 67 Stat. at L. 168 § 53 (1827)). In 1873, the Virginia Supreme Court opined that various theft offenses were "so much alike in many respects and often separated by lines so indistinct, and almost imaginary, that it was difficult for the prosecutor, in most cases, to determine, *a priori*, which particular crime to charge in the indictment." Anable v. Com., 65 Va. (24 Gratt.) 563, 580 (1873). This criticism of arbitrary distinctions between larceny, embezzlement, and false pretenses, was expanded upon and echoed by many subsequent commentators. See Stuart P. Green, Thirteen Ways to Steal a Bicycle, 17, 284 n. 67 (2012) (hereinafter "Green at __"); Com. v. Ryan, 30 N.E. 364, 364-65 (Mass. 1892); Van Vechten v. Am. Eagle Fire Ins. Co., 146 N.E. 432, 433 (N.Y. 1925).

In the 1950s and 60s, the American Law Institute attempted to resolve some of these arbitrary distinctions by drafting and including in the Model Penal Code a consolidated theft statute, from which many states borrowed in crafting their own statutes.[6] See Model Penal Code § 223.1 (1962). By 1985, just four years before the General Assembly enacted the consolidated theft statute at issue in this appeal, the

---

[5] Prior to this consolidation, various crimes were included, along with false pretenses, at Tennessee Code Annotated §§ 39-1901-62, and another grouping, including larceny and embezzlement crimes, appeared at §§ 39-4201-39 (1975 & 1982 Supp.). One example of the confusing number of defined crimes, and the strangely specific nature of some of the offenses, is "[s]ubstitution of brands of soft drinks." Id. § 39-1926.

[6] According to a recent book on the subject, the Model Penal Code's section on consolidating theft offenses was the most influential provision dealing with specific crime definitions. See Green at 27.

Maryland Supreme Court summarized the state of the law throughout the United States and the movement towards consolidation of theft offenses:

> At least thirty-five states, in addition to Maryland, have enacted consolidated theft-related statutes. While the provisions of these statutes vary from state to state, their purpose appears to be, as in Maryland, to create a single statutory crime encompassing various common law theft-type offenses in order to eliminate the confusing and fine-line common law distinctions between particular forms of larceny. Eleven states have enacted provisions virtually identical to those contained in § 341 of the Maryland statute; they are in general conformity with § 223.1(1) of the Model Penal Code (1962).

Jones v. State, 493 A.2d 1062, 1067, 1067 n.7-9 (Md. 1985) (internal citations omitted).[7]

### 2. The 1989 Tennessee Statute

The Criminal Sentencing Reform Act of 1989[8] brought about a "major structural change in Tennessee theft law" by replacing, including, and embracing "traditional theft offenses" into a new statutory "generic" theft offense. Tenn. Code Ann. § 39-14-101 & Sentencing Comm'n Cmnts.[9] Like many other states, Tennessee enacted a consolidated theft statute that is heavily based, both conceptually and textually,[10] on the Model Penal Code. A person commits theft under our statute, when he or she "obtains or exercises control over [] property without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (2014 & 2017 Supp.). Thus, three elements must be proven to establish theft under our statute: "(1) the defendant knowingly obtained or exercised control over property; (2) the defendant did not have the owner's effective consent; and (3) the

---

[7] States have continued to enact consolidated theft statutes in the years since the Maryland decision. See Green at 23.

[8] 1989 Tenn. Pub. Acts, c. 591, § 1.

[9] The Sentencing Commission Comments to the Sentencing Act do not reflect legislation enacted in 1995 or thereafter because the Sentencing Commission terminated on June 30, 1995. Nevertheless, the relevant sections of Tennessee Code Annotated sections 39-14-101 and -103 have not been amended since 1989. Therefore, the Sentencing Commission Comments to section 39-14-101 and -103 remain accurate. See Tenn. Code Ann. § 39-14-103 (2014), Compiler's Notes.

[10] The Tennessee Sentencing Commission, in a 1988 report, described the statute as "consistent with the clear national trend." Tennessee Sentencing Comm'n, Proposed Revised Criminal Code Book II, at 108 (1988).

defendant intended to deprive the owner of the property." State v. Amanns, 2 S.W.3d 241, 244-45 (Tenn. Crim. App. 1999).

Defendant argues that we should interpret the 1989 statute as limited in scope to offenses recognized as theft prior to 1989.[11] It is true that the terms "obtains or exercises control" encompass concepts that were familiar to pre-1989 offenses. For example, larceny involved a physical taking or obtaining of property, while false pretenses involved obtaining property by deception, and embezzlement involved exercising control over property without the owner's consent.[12] But by using these terms the General Assembly clearly did not intend to limit the scope of the 1989 statute to the offenses previously recognized as theft. To the contrary, the General Assembly very broadly defined "[o]btain," as used in the theft statute, declaring that it

> includes, *but is not limited to*, the taking, carrying away or the sale, conveyance or transfer of title to or interest in or possession of property, and includes, *but is not limited to*, conduct known as larceny, larceny by trick, larceny by conversion, embezzlement, extortion or obtaining property by false pretenses . . . .

Tenn. Code Ann. § 39-11-106(a)(24)(B) (emphases added). Twice in this concise statutory definition the General Assembly emphasizes that "[o]btain" encompasses but is not limited in scope to conduct formerly categorized as theft. See also Tenn. Code Ann. § 39-14-101 (stating that theft under the 1989 statute embraces "the separate offenses referenced before 1989 as embezzlement, false pretense, fraudulent conversion, larceny, receiving or concealing stolen property, *and other similar offenses*." (emphasis added)); State v. Young, 904 S.W.2d 603, 606 (Tenn. Crim. App. 1995) ("Even though the legislature intended to simplify the prosecution of theft crimes by consolidating them into a general statute, the legislature also clearly changed the definition of the crime and the elements needed to prove the offense."); State v. Nix, 922 S.W.2d 894, 900-01 (Tenn. Crim. App. 1995) (explaining that a theft, for the purposes of defining robbery, no longer requires asportation under the 1989 theft statute).[13]

---

[11] No Tennessee decision before 1989 addresses theft of real property, nor did any Tennessee statute before 1989 include real property in the various criminal offenses embraced and replaced by the 1989 consolidated theft statute.

[12] For an explanation of how this terminology was derived, see Model Penal Code Commentaries, Part II §§ 220.1-230.5, 163-66 (Official Draft and Revised Comments 1980) (Hereinafter "MPC Commentaries at __"); and compare the language of Tennessee Criminal Code section 39-11-106(a)(24)(A) (2014 & 2017 Supp.), with Model Penal Code sections 223.0(5) and 223.3.

[13] Other state courts have come to the same conclusion about their similarly worded consolidated theft statutes. See, e.g., State v. Linehan, 56 P.3d 542, 547-48 (Wash. 2002) (refusing to limit the term "exert unauthorized control" in its theft statute to embezzlement prosecutions); Roberts v. People, 203 P.3d 513, 517 (Colo. 2009) (refusing to limit its statute to former theft-related crimes and stating that

Thus the scope of our consolidated theft statute is not limited by common-law technicalities, and "distinction[s] between the various theft offenses [are] unimportant; the crime is complete when a person takes property, without the owner's consent with the intent to deprive the owner of the property." Amanns, 2 S.W.3d at 243-44. "[T]he critical inquiry is thus twofold: whether the actor had control of the property, no matter how he got it, and whether the actor's acquisition or use of the property was authorized." MPC Commentaries at 166.[14] As described by one of the principal drafters of the consolidated theft language in the Model Penal Code, Louis B. Schwartz, "[t]here are a lot of ways of stealing. The basic conception of this draft [of the consolidated statute] is that it does not make any difference which way you choose to steal. If you are stealing, you are a thief." Green at 26.

Defendant alternatively argues that the Tennessee consolidated theft statute applies only to tangible, movable property, and does not apply to real property, such as the house at issue in this case. In response, the State points to Tennessee Code Annotated section 39-11-106(a)(28), which defines property as:

> anything of value, including, but not limited to, money, *real estate*, tangible or intangible personal property, including anything severed from land, library material, contract rights, choses-in-action, interests in or claims to wealth, credit, admission or transportation tickets, captured or domestic animals, food and drink, electric or other power.

Tenn. Code Ann. § 39-11-106(a)(28) (emphasis added). We agree with the State on this issue, for several reasons.

First, the Sentencing Commission Comments for Tennessee Code Annotated section 39-14-103 state directly that the statute "punishes theft of property as defined in § 39-11-106."[15] Furthermore, the "[d]efinitions" section includes other terms that appear in

---

"those crimes were expressly abolished with the adoption of the consolidated theft statute, for the express purpose of removing the distinctions and technicalities that previously existed in the pleading and proof of theft-like crimes").

[14] Along the same lines, in commentary accompanying the proposed legislation, the Sentencing Commission explained that under the consolidated theft statute, the focus shifted to "the harm that accompanies the acquisitive conduct, however the acquisition was accomplished." Tennessee Sentencing Comm'n, Proposed Revised Criminal Code Book II, at 108 (1988).

[15] The Model Penal Code section on theft of property, on which the Tennessee and other state statutes are based, similarly defines property to include "anything of value," including real estate. Model Penal Code § 223.0(6). See also, e.g., 720 Ill. Comp. Stat. Ann. 5/15-1; People v. Perry, 864 N.E.2d 196, 204-10 (Ill. 2007) (discussing the scope of the "anything of value" language in the context of theft prosecutions).

the theft of property statute, such as "[d]eprive," "[e]ffective consent," "[o]btain," and "[o]wner." Tenn. Code Ann. §§ 39-11-106(a)(8), (9), (24), and (26).

More importantly for purposes of this appeal is a distinction drawn in the Model Penal Code that the General Assembly has chosen *not* to adopt. Specifically, the Model Penal Code distinguishes, in the definition of the crime of "[t]heft by [u]nlawful [t]aking or [d]isposition," between movable and immovable property:

> (1) Movable Property. A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof.

> (2) Immovable Property. A person is guilty of theft if he unlawfully transfers immovable property of another or any interest therein with purpose to benefit himself or another not entitled thereto.

Model Penal Code § 223.2. The comments in § 223.1, explain,

> Immovable property, principally real estate, is stolen if one unlawfully transfers the property of another, or an interest therein, with purpose to benefit himself or another not entitled thereto. The major purpose of the distinction is to avoid theft liability for such conduct as trespass or occupying real property beyond the terms of a lease.

Model Penal Code § 223.1, Explanatory Note. The Model Penal Code drafters believed that the definition of theft was broad enough to encompass and apply to theft by physical occupation of real property unless an express distinction were drawn, specifying that immovable property could only be subject to theft by "unlawfully transfer[ring the] property." Some states have incorporated this exact distinction and limitation in their own consolidated theft statutes. See, e.g., N.J. Stat. Ann. § 2C:20-3; 18 Pa. Cons. Stat. Ann. § 3921; 9 Guam Code Ann. § 43.30; Neb. Rev. Stat. § 28-511; Ky. Rev. Stat. Ann. § 514.030; State v. Kosch, 133 A.3d 669, 678-79 (N.J. Super. Ct. App. Div. 2016) (explaining that, while conduct of squatters is not criminalized under the New Jersey statute, the defendant could be found guilty of fraudulently transferring the right to charge rents to the property to himself).[16] Other states have simply excluded immovable property from their theft statutes. See, e.g., Ala. Code § 13A-8-1(11); Ark. Code Ann. § 5-36-101(8); Del. Code Ann. tit. 11 § 857(6); see also Wayne R. LaFave, 3 Subst. Crim. L. § 19.4 n.7 (2d ed.); Sheffield v. State, 708 So. 2d 899, 900 (Ala. Crim. App. 1997) (explaining over the course of the entire opinion why immovable property cannot be the object of theft under the Alabama statute and reversing the defendant's theft conviction). At least one state, Maryland, has adopted a statute clarifying that theft does not include

---

[16] Citations to statutes from other States are current through 2017 from Westlaw.

trespass or occupying land without authorization. Md. Code Ann., Crim. Law § 7-101(d)(2).[17]

Tennessee has not adopted any of these limitations. Indeed, in our criminal code, the term movable property is used only once in a statute not relevant to this appeal. See Tenn. Code Ann. § 39-11-106(a)(35) (defining "[s]ervices" that can be stolen as the "use of vehicles or other movable property"). The theft statute makes no distinction between movable and immovable property, either in the definition of theft, id. § 39-14-103, or in the definition of property, id. § 39-11-106(a)(28). And although we have previously discussed one statutory definition of "[o]btain," our criminal code defines "[o]btain" twice.[18] Tennessee Code Annotated section 39-11-106(a)(24)(A)(i) states that "[o]btain" means to "[b]ring about a transfer or purported transfer of property or of a legally recognized interest in the property, whether to the defendant or another." This language is nearly identical to the Model Penal Code's description of theft of *immovable* property, including real estate. However, unlike the Model Penal Code, which uses this language to define the *exclusive* means of stealing real or immovable property, Model Penal Code § 223.2(2), under our statute, a person commits theft of real property *either* by obtaining (under sub-section (A) or (B)) *or* exercising control of real property. Tenn. Code Ann. §§ 39-14-103, 39-11-106(a)(24). Thus, no limitations in our consolidated theft statute preclude its application to theft of real property generally or distinguish between real and personal property for purposes of the conduct requirements for carrying out a theft.

Given the options available to the General Assembly when the consolidated theft statute was enacted and the statutory language it chose to adopt, we conclude that the General Assembly intended our consolidated theft statute to apply to theft of real property in the same way it applies to other property. That decision was and is within the competency of the General Assembly, which was fully capable of employing alternate language in the theft statute. See, e.g., Tenn. Code Ann. § 39-14-104 (2014 & 2017 Supp.) (defining theft of services as a person "intentionally obtain[ing] services by

_____

[17] A 1971 proposal to reform federal criminal law would have recognized but limited the offense of theft of real property to a "transfer or attempted transfer of an interest in the property." National Commission on Reform of Federal Criminal Laws, Final Report § 1741(f) (1971). The Commission submitting this proposal was headed by Louis B. Schwarz, former deputy director of the Model Penal Code drafting, but the Commission's proposed statutory revisions were never enacted despite significant support and repeated efforts. See Ronald L. Gainer, Remarks on the Introduction of Criminal Law Reform Initiatives, 7 J.L. Econ. & Pol'y 587, 589 (2011).

[18] The dual definitions of the term are perhaps a result of borrowing language from different sources in the drafting of the Tennessee provision. The first definition, at Tennessee Code Annotated section 39-11-106(a)(24)(A), is nearly identical to the Model Penal Code definition, section 223.0(5), as used in section 223.3, [t]heft by [d]eception. The second definition, at Tennessee Code Annotated section 39-11-106(a)(24)(B), is nearly identical to how other states have defined the phrase "obtains or exerts control" (or "obtains or exercises control"). See e.g., 720 Ill. Comp. Stat. Ann. 5/15-8; Kan. Stat. Ann. § 21-5111(r); N.H. Rev. Stat. Ann. § 637:3(II).

deception, fraud, coercion, forgery, false statement, false pretense or any other means to avoid payment for the services").

Defendant argues that the theft statute should not apply to her because this was essentially a civil matter and that "a squatter is not subject to prosecution under [Tennessee's consolidated] theft statute[]." To the extent that the Defendant occupied the house without the Bank's effective consent, it does not matter, as Defendant states, that there were civil remedies available to the Bank to evict Defendant, or that the Uniform Residential Landlord Tenant Act has provisions that govern the conduct at issue in this case. We note that the Model Penal Code Commentaries have a fairly detailed note on this subject along the lines of the Defendant's points.[19] But, as already explained, the Tennessee General Assembly chose not to limit theft to personal property. Courts may neither alter or amend statutes nor substitute our own policy judgments for those of the General Assembly. Britt v. Dyer's Empl. Agency, Inc., 396 S.W.3d 519, 523 (Tenn. 2013). Perhaps the General Assembly *should* have excluded real property from the theft statute, but it has not done so. See Am. Heritage Apartments, Inc. v. Hamilton Cnty. Water and Wastewater Treatment Auth., 494 S.W.3d 31, 50 (Tenn. 2016). "Just as we may not overlook or ignore any of the words in a statute, we must be circumspect about adding words to a statute that the General Assembly did not place there." Coleman v. State, 341 S.W.3d 221, 241 (Tenn. 2011) (citations omitted). Here, the statute is broad enough to encompass theft of real property, and we are not at liberty to impose a restriction on that language.

## B. Is the proof in this case sufficient to support a conviction for theft of real property?

Having concluded that the Tennessee theft statute encompasses theft of real property, we acknowledge that this is a case of first impression for this Court. Historically, the more typical case of theft of real property involves a fraudulently induced transfer of title to real property. See e.g., State v. Toney, 90 N.E. 142 (Ohio 1909) (affirming a theft conviction where the defendant forged documents of title and sold the "fraudulent[ly] obtain[ed]" real property to third-parties); People v. Rabe, 261 P. 303 (Cal. 1927) (affirming a theft conviction where defendant received real property for preorganization stock in a company based on misrepresentations as to the assets and activities of the company).

We recognize that this case is unique in many ways, both factually and legally, but our obligation is simply to determine whether the evidence is sufficient to support Defendant's conviction for theft of property valued at over $250,000.

---

[19] See MPC Commentaries at 172-74; see also Green at 26.

Here, the State presented proof showing that Defendant entered the East Memphis house, posted signs indicating it belonged to her, padlocked the gate to the property, changed the locks on the doors, and told a reporter attempting to enter the property that it belonged to her. Before Defendant ever occupied the house, she had already filed papers with the Register of Deeds Office by which she sought to obtain record ownership of the property. This action, coupled with her physical occupation and seizure of the house, is sufficient evidence to support the jury's finding that Defendant obtained and/or exercised control over the real property. These facts, particularly Defendant's filing with the Register of Deeds Office, are also sufficient to support the jury's finding that Defendant had the intent to permanently deprive the Bank of the property. Tenn. Code Ann. § 39-11-106(a)(8)(A). The damage to the East Memphis home was minimal, and the duration of Defendant's physical seizure and occupation of the real property short lived, but sufficient evidence supports the jury's findings on these issues.

Defendant also argues that theft of real property is too severe a criminal offense to charge under the circumstances of this case and that other less severe criminal charges, such as criminal trespass, Tenn. Code Ann. § 39-14-405 (2014 & 2017 Supp.), vandalism, Tenn. Code Ann. § 39-14-408 (2014 & 2017 Supp.), or filing a transfer document without a legal or equitable basis, Tenn. Code Ann. § 39-17-116 (2014), were more appropriate on these facts. Even assuming that Defendant's conduct could have supported less severe charges, with penalties more proportionate to the actual harm that Defendant caused, we agree with the Court of Criminal Appeals that decisions about "whether to prosecute and for what offense" are matters of prosecutorial discretion. Gentry, 2016 WL 4264266, at *6 (quoting Dearborne v. State, 575 S.W.2d 259, 262 (Tenn. 1978)). Although the facts of most "squatter" cases would not support a conviction for theft, certain fact scenarios do qualify.

Despite Defendant's argument, this is not a case where a squatter temporarily occupies an abandoned property and takes no action that evidences any intent to deprive the owner of the property. This is also not a case where a tenant holds over or fails to pay rent and questions of proof as to the intent to deprive the owner of any ownership interest in the property would similarly be difficult. Under these scenarios, if the State cannot prove an essential element of theft, it would be limited to charging a defendant with a less serious offense such as criminal trespass or vandalism, if at all.

However, we reiterate that this is not a typical case. And Defendant was not a mere squatter. The purported deed that she filed with the Register of Deeds Office, along with the other facts demonstrating her intent to exclude the Bank from accessing the property and her intent to deprive the bank of its entire interest in the house, distinguish this case.

### C. For sentence classification purposes, what is the proper valuation method for theft of real property?

Tennessee Code Annotated section 39-14-105 (2014 & 2017 Supp.) establishes penalties for theft based on the "value of the property or services obtained." Property value for purposes of this statute means "the fair market value of the property . . . at the time and place of the offense." Tenn. Code Ann. § 39-11-106(a)(36)(A)(i). Alternatively, "[i]f the fair market value of the property cannot be ascertained," then replacement cost is the measure of value. Id. § 39-11-106(a)(36)(A)(ii); see also State v. Smith, M2014-01969-CCA-R3-CD, 2015 WL 6082625, at *4 (Tenn. Crim. App. Oct. 16, 2015) (explaining that the cost of repairs is the appropriate means for determining replacement costs in cases of vandalism). If either of those methods fails to yield an ascertainable valuation, the property "is deemed to have a value of less than fifty dollars." Id. § 39-11-106(a)(36)(C).[20] Here, the State offered ample evidence to establish the fair market value of the East Memphis house, and the jury convicted Defendant of theft over $250,000, a Class A felony with a sentencing range of fifteen to twenty five years. Tenn. Code Ann. § 40-35-112(a)(1) (2014 & 2017 Supp.).

Defendant argues that the appropriate valuation for purposes of grading her offense is the rental value of the East Memphis house for the time that she actually occupied the house. We recognize that, given the high fair market value of real estate, persons convicted of theft of real property will potentially be subject to longer sentences. But no language in either Tennessee Code Annotated section 39-14-105, grading the severity of theft offenses, or in section 39-11-106(a)(36), explaining how to value property, authorizes courts to use the rental value of the duration of a theft to determine the value of the property that was taken.

Cases where rental value has been used in determining the value of the property in theft convictions in other states are distinguishable. In those cases, a defendant either entered into a lease agreement with no intent to pay the landlord, see, e.g., People v. Bell, 128 Cal. Rptr. 3d 588, 592 (Cal. Ct. App. 2011); People v. Hagan, C072508, 2013 WL 4851250, at *2 (Cal. Ct. App. Sept. 11, 2013), or a defendant unlawfully collected rent on properties, see, e.g., Kosch, 133 A.3d at 678 (defendant used fraudulent documents to represent to third-parties that he had a right to rent the properties but never filed the documents or otherwise acted to transfer title to the properties); State v. Burrell, 2011-Ohio-5655, at ¶ 6 (defendant believed "he could do whatever he pleased" with a house, including renting it to third-parties while it was the subject of a foreclosure action). In these cases, the evidence supported the conclusion that the defendants intended to deprive

---

[20] Sub-section (B) covers value determinations for documents and debt instruments and sub-section (D) covers deductions for consideration given by the defendant and for valuable interests the defendant may have in the property taken, neither of which is applicable here. Tenn. Code Ann. § 39-11-106(a)(36)(B), (D).

the rightful owners of the properties of rental proceeds or value, but *not* that the defendants intended to take exclusive ownership or title to the properties.

Where there is clear evidence that a defendant intended to take ownership and title to real property, courts have used the full fair market value of the property to grade the theft. People v. Jensen, 172 P.3d 946 (Colo. App. 2007) (grading theft based on the fair market value of land where the defendant received a warranty deed to the land from the victim as collateral for co-signing a felony appearance bond and subsequently filed a quitclaim deed to the property and refused to give either deed to the victim after the bond conditions lapsed); Com. v. Figueroa, 859 A.2d 793, 798 (Pa. Super. 2004) (finding sufficient evidence that defendant intended "to steal title" to real property from deceased owners via forged deeds and grading the offense based on the value of the real property); Brown v. State, 64 N.E.3d 1219, 1231 (Ind. App. 2016) (discussing defendant's intent to take ownership of a house, by occupying it much like the Defendant did in this case, with a value of "at least $100,000" in upholding a burglary conviction).

As discussed above, the evidence in this case established that Defendant intended to deprive the Bank of ownership of the East Memphis real property, and not just the rental value of it. Thus, fair market value is the appropriate measure of the value of the real property Defendant obtained. To establish fair market value, the prosecution offered proof to show that the home sold for over $2 million shortly after Defendant's arrest and that it had been appraised for property tax purposes at $2.75 million in 2012 and $3 million in 2013. Thus, we conclude that sufficient evidence supports the jury's verdict finding Defendant guilty of theft of property valued at over $250,000, a Class A felony. Tenn. Code Ann. § 39-14-105(a)(6).

### D. Is the proof in this case sufficient to support a conviction for aggravated burglary?

Defendant's sole challenge to the sufficiency of the evidence to support her conviction for aggravated burglary is that because she never committed theft, she did not have the requisite "intent to commit a felony, theft or assault" when she entered into the East Memphis home. Tenn. Code Ann. § 39-14-402. A person commits aggravated burglary when she (1) enters a habitation, defined as any structure designed or adapted for the overnight accommodation of persons; (2) without the effective consent of the property owner; and (3) with intent to commit a felony, theft, or assault. Tenn. Code Ann. §§ 39-14-401 to -403. As we have already concluded that sufficient evidence supports the jury's verdict finding Defendant guilty of theft, Defendant's challenge to the sufficiency of the evidence to support her aggravated burglary conviction is without merit.

### E. Adverse Possession and Claim of Right Issues

Defendant asserts that the trial court abused its discretion in limiting defense counsel's cross-examination of a witness about the legal doctrine of adverse possession

and again abused its discretion when it excluded discussion of adverse possession from closing arguments. The propriety, scope, manner, and control of cross-examination of witnesses . . . remain within the discretion of the trial court. State v. Echols, 382 S.W.3d 266, 285 (Tenn. 2012) (citing State v. Reid, 213 S.W.3d 792, 838 (2006); State v. Rice, 184 S.W.3d 646, 670 (2006)). This Court will not disturb the limits placed upon cross-examination by the trial court, unless the trial court has unreasonably restricted the right. Reid, 213 S.W.3d at 839 (citing State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995)).

The record belies Defendant's assertion that the trial court limited her questioning of the witness. The record shows that Defendant cross-examined a prosecution witness, real estate agent Mr. Dickens, about the elements of adverse possession in an apparent attempt to establish the affirmative defense of claim of right. See Tenn. Code Ann. § 39-14-107(1)-(2) (2014).[21] On redirect examination, the State asked Mr. Dickens, without objection from Defendant, whether adverse possession is a defense to theft. The witness responded that, based on what he had learned, it is not. Counsel for Defendant broached the subject again on re-cross, posing questions aimed at ascertaining the basis of the witness's statement that adverse possession is not a defense to theft. The non-attorney witness responded that he had learned over the course of this case that it is not a defense. As counsel for Defendant pressed the witness to clarify his knowledge of adverse possession the prosecution objected. In ruling on the objection, the trial court stated that it was not going to allow either the defense or the prosecution to delve any farther into adverse possession. Counsel for Defendant then asked the trial court for permission to ask the witness if he knew whether adverse possession is a defense to theft. The trial judge allowed defense counsel to pose this question, and the witness responded that he did not know. Defense counsel did not seek permission to ask additional questions, nor did Defendant make an offer of proof about other questions that would have been asked but for the trial court's ruling. Tenn. R. Evid. 103(a)(2). Thus, we conclude that Defendant's assertion that she was limited in questioning the witness about adverse possession is wholly without merit.

In our view, the trial court afforded Defendant great latitude by allowing any questions about adverse possession to support the affirmative defense of claim of right. See Tenn. Code Ann. § 39-14-107(1)-(2). Defendant remained in this property for only a week and adverse possession requires possession for a period of years. See Cumulus Broad., Inc. v. Shim, 226 S.W.3d 366, 376 (Tenn. 2007). The trial court nevertheless

---

[21] These statutory provisions state:

It is an affirmative defense to prosecution under §§ 39-14-103, 39-14-104 and 39-14-106 that the person:
(1) Acted under an honest claim of right to the property or service involved;
(2) Acted in the honest belief that the person had the right to obtain or exercise control over the property or service as the person did . . . .

allowed Defendant to ask questions about adverse possession to support the claim of right defense and instructed the jury on the claim of right defense.  Having heard all the evidence, the jury simply exercised its prerogative to reject this defense.  Defendant's assertion that the trial court improperly limited her questioning of this witness is simply without merit.

Also without merit is Defendant's assertion that the trial court erred by limiting closing argument about adverse possession.  Closing arguments are not evidence.  State v. Shaw, 37 S.W.3d 900, 904 (Tenn. 2001).  Furthermore, trial courts have broad discretion to control closing arguments.  State v. Odom, 336 S.W.3d 541, 559 (Tenn. 2011).  Having allowed Defendant great latitude in questioning witnesses about adverse possession and instructing the jury on her claim of right defense, the trial court did not abuse its discretion by imposing limitations on closing argument.  Moreover, even assuming the trial court abused its discretion, Defendant has failed to establish, or even allege, any prejudice resulting from this limitation.  State v. Rodriguez, 254 S.W.3d 361, 371-72 (Tenn. 2008) (quoting Tenn. R. App. P. 36).  Again, the jury received an instruction on the claim of right defense and rejected it.  The Defendant is not entitled to relief on this claim.

## IV.  Conclusion

For the reasons stated herein, the judgments of the trial court and Court of Criminal Appeals are affirmed.  Because the Court of Criminal Appeals' ruling on consecutive sentencing was not appealed and remains undisturbed, this matter is remanded for resentencing in accordance with the Court of Criminal Appeals' decision that consecutive sentencing was not appropriate in this case.  It appearing that Defendant is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
CORNELIA A. CLARK, JUSTICE