# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### September 5, 2019 Session

## STATE OF TENNESSEE v. REUBEN EUGENE MITCHELL

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Knox County
No. 102034    Steven W. Sword, Judge**

___

### No. E2017-01739-SC-R11-CD

___

The defendant, Reuben Eugene Mitchell, was convicted of one count of arson and one count of presenting a false or fraudulent insurance claim. The Court of Criminal Appeals affirmed the defendant's arson conviction but reversed his conviction for presenting a false or fraudulent insurance claim. We granted the State's application to appeal to address whether the proof at trial was sufficient to support the defendant's conviction for presenting a false or fraudulent insurance claim. Our review leads us to conclude that the evidence was sufficient. Accordingly, we reverse in part the judgment of the Court of Criminal Appeals and reinstate the defendant's conviction for presenting a false or fraudulent insurance claim.

### Tenn. R. App. P. 11 Appeal by Permission;
### Judgment of the Court of Criminal Appeals Affirmed in Part,
### Reversed in Part; Judgments of the Trial Court Affirmed

ROGER A. PAGE, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, SHARON G. LEE, and HOLLY KIRBY, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Katherine C. Redding, Assistant Attorney General; Randall E. Nichols, District Attorney General; and William C. Bright and Andrea Kline, Assistant District Attorneys General, for the appellant, the State of Tennessee.

Joshua D. Hedrick, Knoxville, Tennessee, for the appellee, Reuben Eugene Mitchell.

1

# OPINION

## I. FACTUAL AND PROCEDURAL BACKGROUND

After a fire caused extensive damage to his house, the defendant was charged with one count of arson[1] and one count of presenting a false or fraudulent insurance claim.[2] At the ensuing jury trial, the following evidence was adduced.

On November 30, 2011, the defendant applied to Allstate Property and Casualty Insurance Company ("Allstate") for a homeowner's insurance policy. On December 1, 2011, Allstate issued the homeowner's policy, number 9 63 861797, naming the defendant as the insured and the defendant's residence as the insured dwelling ("the Policy"). A copy of the Policy, which covered the house, "other structures," personal property, and "additional living expense," was admitted into evidence. As to the dwelling, the Policy covered "sudden and accidental direct physical loss." It also provided liability protection.

In the portion titled "Section I Conditions," beginning on page 16, the Policy contains multiple provisions directing what the insured "Must Do After A Loss." One of the requirements is to "immediately give" Allstate or its agent "notice." Also required, "within 60 days after the loss," is a "signed, sworn proof of the loss" including "the actual cash value and amount of loss for each item damaged, destroyed or stolen." Nowhere in the criteria for "What You Must Do After A Loss" is the insured required to "file" a "claim" for a loss resulting from fire damage.

On the evening of December 5, 2011, just a few days after the Policy was issued, a fire caused extensive damage to the living room area of the defendant's residence. The defendant was not at home, and neighbors called the fire department. Although the fire had been extinguished, the defendant called the fire department after he arrived home the morning after the fire. The defendant, who testified at trial, also called Allstate and told Allstate that there had been a house fire. He acknowledged that he called Allstate "to report the loss" and that his call was to "start the process to file a claim." However, the defendant also testified that he did not fill out any claim forms for Allstate, and he denied telling anyone at Allstate that he wanted to be paid for a property loss or that he wanted

---

[1] The indictment charged that the defendant "did knowingly damage, by fire a structure . . . without the consent of all persons having a possessory and proprietary interest in said structure[.]" *See* Tenn. Code Ann. § 39-14-301(a)(1) (2010) (defining arson as "knowingly damag[ing] any structure by means of a fire or explosion . . . [w]ithout the consent of all persons who have a possessory, proprietary or security interest therein").

[2] The indictment charged that the defendant "did unlawfully and intentionally present and cause to be presented to Allstate Insurance Company, a false and fraudulent claim for the payment of a loss upon a contract of insurance coverage for property located at" the address of his residence. *See* Tenn. Code Ann. § 39-14-133 (2010).

Allstate to make repairs. He stated that he did not fill out a list of property that he lost and wanted replaced but added that an Allstate representative did so.

After reporting the fire, the defendant met with two Allstate representatives, Mr. David Gray and Ms. Heather Stover. According to Mr. Gray, a "large loss adjuster," the defendant told Mr. Gray that "he had been home, and he had had a fire going in the fireplace and had to leave the home and shortly after he left, the fire took place in the home."

On December 9, 2011, Ms. Stover, a "large loss contents adjuster," presented the defendant with a document titled "Advance Payment Agreement" and a check for $1,000. The Advance Payment Agreement, signed by the defendant on December 9, 2011, was admitted into evidence. This document references "Claim No.: 0228336426" and "Policy No.: 000963861797." It also lists the defendant as the "Policyholder(s)," the defendant's residence as the "Address of Insured Property," and "[f]ire" as the "Type of Damage." The Advance Payment Agreement further provides as follows:

> In consideration of the advance payment described below, the policyholder(s) ("you") and Allstate ("we") agree as follows:
>
> Before any benefit can be paid under this policy, you have an obligation to fully comply with all policy requirements in submitting *the claim*. We have an obligation to investigate and determine if the policy is valid, if *the claim* is valid and the extent of coverage that may be applicable to the loss, if any. We will continue to investigate *the claim*. If there are requirements in the policy which you have not yet completed, you need to comply with those requirements.
>
> In the meantime, in good faith and to prevent any undue hardship which this loss may cause you, we advance $1,000.00 on the loss under the following terms and conditions:
>
> > 1) that this advance shall not be considered payment under any portion of the policy;
> >
> > 2) that if either the policy or *the claim* is not valid and payment is not required by us, you will repay the advance; and
> >
> > 3) we, in making this advance, reserve and do not waive any right or requirement under the policy described above, whether procedural or substantive.

By signing this agreement, you accept the advance payment fully understanding that we reserve all rights and requirements under the policy described above, including the right to receive from you proper notice and proof of loss, and the right to ask you to take an examination under oath. If *the claim* is honored, we may apply the advance against any benefit due under the policy, and if it is determined that any part of the policy or *the claim* is not valid, and no payment is due, you will repay the advance to us in full.

The parties hereby acknowledge and agree to the terms set forth above.

(Emphases added). The defendant acknowledged taking the $1,000 payment and signing the Advance Payment Agreement.

When questioned about the Advance Payment Agreement, Ms. Stover explained: "When we have a customer who has had a fire claim with extensive damage, we offer an advance payment just for them to start getting some of the things they need right away, and it's taken off of their total settlement if and when we pay the claim." She added that "any time we do have a fire claim that's extensive damage such as this one, we do offer an advance payment just for people to get started replacing some of their personal property." Asked about the process following an advance payment, Ms. Stover further explained:

Well, normally, we . . . prepare estimates. We have to do an investigation; our cause and origin begins the investigation. And if everything comes back okay with the investigation, then we proceed with paying the claim, but in this situation, it went to our special investigations unit and when it does that, . . . it's removed from the adjuster's handling and into the special investigations unit where they do a more extensive investigation.

According to Ms. Stover, at the time she delivered the check to the defendant, "everything had been done to start the processing of the claim." She reiterated that any advance payment would be deducted from the total proceeds payable on a valid claim. If no valid claim were eventually processed, the advance payment would have to be repaid by the recipient. On cross-examination, Ms. Stover asserted that the advance payment was "issued in good faith that we will pay the claim." She also acknowledged that she did not receive a claim form or a signed, sworn proof of loss document from the defendant.

Allstate hired EFI Global, a nationwide company that conducted investigations into the causes and origins of fires, to investigate the cause and origin of the fire. Gary M. Young, an investigator with EFI Global, reported to the scene and spoke with the

defendant. The defendant acknowledged speaking with Mr. Young over the phone and stated that Mr. Young told him that Allstate "wanted to investigate [the fire] first before they file a claim."

Mr. Young subsequently prepared a written report about the cause of the fire, dated December 30, 2011 ("the Report"). A copy of the Report was admitted into evidence, and in it, Mr. Young opined that "this fire was intentionally precipitated, by introducing accelerant underneath and behind the loveseat in the living room, and then igniting the accelerant with a manually and intentionally introduced ignition source." The Report also noted: "I questioned [the defendant] as to whether or not he has any opinion as to the cause for this fire loss. He revealed that it is his opinion that this fire was apparently caused by some problem with the wood burning fireplace."

E. Metts Hardy of EFI Global, the Vice President of fire investigations for EFI Global, reviewed and signed the Report. Because Mr. Young was deceased by the time of trial, Mr. Hardy testified about EFI's investigation. The trial court recognized Mr. Hardy as "an expert in the area of origin and cause relating to fires." Mr. Hardy opined at trial that the fire had been intentionally set and had not originated in the fireplace. Based on this information, Allstate did not pay the defendant any further money under the Policy. Rather, this prosecution commenced on December 28, 2011, less than a month after the fire. Allstate cancelled the Policy on February 14, 2012.

The defendant offered a different explanation of the fire. He explained that, due to his failure to pay his bills, both water and electricity to the house had been cut off weeks before the fire. On the evening of December 5, he arrived home during the early evening and began a fire in the fireplace. He started the fire with a small starter log, some kindling wood, and starter gel. He stated that there were no large pieces of wood in the fireplace when he began the fire.

After starting the fire, the defendant claimed that he received a phone call informing him that his sister was critically ill. He "went into panic mode" and, to extinguish the fire, he "grabbed some wet logs" and threw the wet logs into the fireplace. He explained that the logs had been out in the rain all week and he thought that they would put out the fire he started. He stated that, after he threw the wet logs into the fireplace, it "looked like" the fire was extinguished. He then left the house.

The defendant claimed that he drove to his sister's house, where she was being prepared for transport in an ambulance. He followed the ambulance to the hospital and did not leave until the next morning. He did not realize that his house had caught fire until his return home on December 6, 2011. As to the presence of an accelerant, the defendant explained that he had recently refinished the living room floor and used polyurethane, a flammable substance.

5

After considering the evidence, the jury rejected the defendant's explanation of the fire and convicted him of arson. The jury also convicted the defendant of presenting a false or fraudulent insurance claim in the amount of $10,000 or more but less than $60,000. After a subsequent hearing, the trial court sentenced the defendant as a Range I, standard offender to four years of incarceration on each conviction, to be served concurrently and suspended to supervised probation.

The defendant appealed, and the Court of Criminal Appeals affirmed the defendant's conviction of arson. *State v. Mitchell*, No. E2017-01739-CCA-R3-CD, 2018 WL 6439502, at *13 (Tenn. Crim. App. Dec. 7, 2018). However, a majority of the Court of Criminal Appeals panel concluded that the evidence was insufficient to support the false or fraudulent insurance claim conviction and, therefore, reversed that conviction and dismissed the charge. *Id.* We granted the State's ensuing application for permission to appeal to address whether the proof at trial was sufficient to support the defendant's conviction for presenting a false or fraudulent insurance claim.

## II. STANDARD OF REVIEW

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, the defendant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977) (quoting *Farmer v. State*, 343 S.W.2d 895, 896 (Tenn. 1961)).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *see also State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990) (citations omitted). This Court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate

6

the evidence. *Dorantes*, 331 S.W.3d at 379; *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). Because a jury conviction removes the presumption of innocence that the defendant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted defendant, who must demonstrate to this Court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (quoting *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

### III. ANALYSIS

In conducting our sufficiency review, we must evaluate the proof in light of the elements of the crime. *See State v. Gentry*, 538 S.W.3d 413, 420 (Tenn. 2017) (recognizing that the first step of a sufficiency review is to "'examine the relevant statute(s) in order to determine the elements' of the offense that must be proven by the prosecution beyond a reasonable doubt" (quoting *State v. Stephens*, 521 S.W.3d 718, 723-24 (Tenn. 2017)). Accordingly, our review of the evidence in this case depends upon our construction of the false or fraudulent insurance claims statute, Tennessee Code Annotated section 39-14-133, which provides:

> Any person who intentionally presents or causes to be presented a false or fraudulent claim, or any proof in support of such claim, for the payment of a loss, or other benefits, upon any contract of insurance coverage, or automobile comprehensive or collision insurance, or certificate of such insurance or prepares, makes or subscribes to a false or fraudulent account, certificate, affidavit or proof of loss, or other documents or writing, with intent that the same may be presented or used in support of such claim, is punished as in the case of theft.

Tenn. Code Ann. § 39-14-133 (2010).

When engaging in statutory interpretation, "well-defined precepts apply." *State v. McNack*, 356 S.W.3d 906, 908 (Tenn. 2011). "The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995) (citing *State v. Sliger*, 846 S.W.2d 262, 263 (Tenn. 1993)); *see also Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009) (citing *State v. Sherman*, 266 S.W.3d 395, 401 (Tenn. 2008)). In construing statutes, Tennessee law provides that courts are to avoid a construction that leads to absurd results. *Tennessean v. Metro. Gov't of Nashville*, 485 S.W.3d 857, 872 (Tenn. 2016). "Furthermore, the 'common law is not displaced by a legislative enactment, except to the extent required by the statute itself.'" *Wlodarz v. State*, 361 S.W.3d 490, 496 (Tenn. 2012) (quoting *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 679 (Tenn. 2002)), *abrogated on other grounds by Frazier v. State*, 495 S.W.3d 246 (Tenn. 2016). "When statutory

7

language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would extend the meaning of the language . . . ." *Carter*, 279 S.W.3d at 564 (citations omitted).

The false insurance claim statute criminalizes two courses of conduct. The elements of the first prohibited course of conduct are as follows: (1) intentionally; (2) presenting or causing to be presented; (3) a false or fraudulent; (4) claim or any proof in support of such claim; (5) for the payment of a loss or other benefit; (6) upon any contract of insurance coverage. *See* Tenn. Code Ann. § 39-14-133. The elements of the second prohibited course of conduct are as follows: (1) preparing, making, or subscribing to; (2) a false or fraudulent; (3) account, certificate, affidavit or proof of loss, or other documents or writing; (4) with intent; (5) that the same may be presented or used in support of; (6) a claim for the payment of a loss or other benefit; (7) upon any contract of insurance coverage. *See id.* The defendant was charged with engaging in the first prohibited course of conduct.

The majority of the Court of Criminal Appeals panel held that the proof was insufficient to support the defendant's conviction of this offense because "[t]he defendant legally, and under the policy, did not initiate a claim because he did not file the necessary and required documentation pursuant to the policy, including a proof of loss, in the requisite time period." *Mitchell*, 2018 WL 6439502, at *12. The intermediate appellate court relied on the Policy's technical requirements attendant upon filing a claim and concluded that "the defendant in this case did not meet the conditions precedent to filing a claim." *Id.* The majority reasoned,

> While the defendant made Allstate aware that there had been a fire, he did not file any documentation to support his filing of a claim for the initiation of a claim. Further, he did not comply with the requirements for filing a claim because he did not file a proof of loss. *For the same reasons that Allstate could have denied the defendant coverage for not adequately filing a claim, we conclude that the evidence is insufficient to support that he fraudulently filed an insurance claim against Allstate.*

*Mitchell*, 2018 WL 6439502, at *12 (emphasis added). The majority dismissed the significance of the Advance Payment Agreement that the defendant signed and the $1,000 advance payment that Allstate made to the defendant thereunder on the basis that, "[b]y the plain language of the agreement[,] the $1,000 is an advance, and not part of the coverage pursuant to the policy." *Id.*

Judge John Everett Williams dissented from the majority's holding that the evidence was not sufficient to support the defendant's conviction for presenting a false or fraudulent insurance claim, reasoning as follows:

8

The majority reasons that the defendant did not initiate a claim because he did not submit the documentation required to file a claim under the insurance policy, including a proof of loss, in the requisite time period. In my opinion, the language of Tennessee Code Annotated section 39-14-133, which criminalizes insurance fraud, is broad and does not limit a conviction for the offense to those instances in which a defendant has adhered to the provisions and niceties of the insurance policy. Under the majority's analysis, an insurance company may determine what constitutes a criminal offense for filing a false insurance claim through its provisions in its insurance policies. Had the legislature intended for insurance companies to have such authority, the legislature would have stated so in the statute.

*Mitchell*, 2018 WL 6439502, at *13 (Williams, P.J., concurring in part and dissenting in part). We agree with Judge Williams' reasoning.

Initially, we note that, as defined in our criminal code: "'Fraud' means as used in normal parlance and includes, but is not limited to, deceit, trickery, misrepresentation and subterfuge, and shall be broadly construed to accomplish the purposes of" the criminal code. Tenn. Code Ann. § 39-11-106(13) (2010).

The false or fraudulent insurance claims statute does not define the word "claim." However, when a statute does not define one of its terms, we may turn to other sources for guidance, including *Black's Law Dictionary*. *See, e.g.*, *State v. Edmondson*, 231 S.W.3d 925, 928 (Tenn. 2007) ("When the Legislature does not provide a specific definition for a statutory term, this Court may look to other sources, including *Black's Law Dictionary*, for guidance."); *see also, e.g.*, *State v. Fitz*, 19 S.W.3d 213, 216 (Tenn. 2000) (relying on *Black's Law Dictionary* for guidance in construing the word "violence" as used in the robbery statutes). *Black's Law Dictionary* defines "claim," as apposite in this context, as "[t]he assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional." *Black's Law Dictionary* (11th ed. 2019), *available at* Westlaw BLACKS. In addition, *Black's* offers a subordinate definition of "insurance claim": "A policyholder's formal report to an insurance company about a loss with a request for a payment based on the insurance policy's terms." *Id.*

Significantly, the statute does not use the term "insurance claim." Rather, it uses the much broader term, "claim." Moreover, as Judge Williams recognized, the statute is drafted very broadly. The statute's clear and unambiguous intent is to criminalize a person's intentional efforts to obtain monies under an insurance contract through the presentation of false or fraudulent information to the insurer. The statute does not require any precise methodology that a person must follow in his efforts to convince an insurance company, through the provision of false or fraudulent information, to pay him money under an insurance policy. The statute certainly does not criminalize some

9

methodologies and not others based on the technical requirements of different insurance policies.

In this case, the Policy required the defendant to submit a written proof of loss within sixty days of the loss. Well within that time frame, however, Allstate concluded that the fire was not a covered loss. Therefore, any proof of loss subsequently submitted by the defendant would have been pointless. More importantly, within a few days of the fire, the defendant made sufficient verbal representations to Allstate to cause Allstate to assign a claim number to the alleged loss and to make an advance payment of $1,000 to the defendant, pending further investigation. *The defendant accepted this payment and signed the Advance Payment Agreement, which refers repeatedly to "the claim."* The defendant's words and actions represented to Allstate that the fire was a covered loss under the Policy, that is, a "sudden and *accidental* direct physical loss" to the defendant's house and its contents. (Emphasis added). Thus, it can certainly be inferred that the defendant was claiming that the fire was accidental based on his conduct in this case.

The defendant's signature on the Advance Payment Agreement also indicated that he understood that the advance payment was provisional pending further investigation of his claim prior to an eventual payment under the Policy. The Court of Criminal Appeals' majority opinion emphasized that, because the $1,000 delivered to the defendant pursuant to this Agreement "shall not be considered payment under any portion of the policy," the $1,000 was not payment of a claim under the Policy. This interpretation elevates form over substance. The common-sense construction of the Advance Payment Agreement is that it enabled Allstate to alleviate an insured's immediate financial concerns resulting from an alleged covered loss while also allowing it to investigate the alleged loss and determine whether a covered loss had been established. If Allstate then determined that the alleged loss was *not* covered by the policy, Allstate was not obligated to pay any benefits under the policy. Indeed, in that event, the recipient of the advance payment was obligated to repay it to Allstate. The Court of Criminal Appeals erred in interpreting the advance payment, and the defendant's acceptance thereof, as independent, separate, and distinct from the underlying Policy and the defendant's apparent intent to recover under the Policy.

We conclude that the defendant's conduct satisfied the statute's elements of intentionally presenting a false or fraudulent claim because, in making his verbal representations to Allstate representatives, signing the Advance Payment Agreement, and accepting the $1,000 advance payment, the defendant was clearly and unambiguously asserting a right to payment under his homeowner's policy, even if that right was contingent or provisional insofar as Allstate had the contractual right to require further documentation, such as a written proof of loss, for final payment. The defendant's words and conduct were fraudulent because they involved, at a minimum, "subterfuge" and led Allstate to consider, at least provisionally, that the fire was a covered loss. Because the Policy entitled the defendant to recover losses resulting from *accidental* direct physical

losses, and because the jury determined that the fire was not accidental but, rather, was set deliberately by the defendant, the jury was entitled to conclude that the defendant had violated the statute prohibiting the presentation of a false or fraudulent insurance claim.

In short, the evidence in this case presented the jury with a textbook example of presenting a false or fraudulent insurance claim. The defendant intentionally informed Allstate that there had been a fire at his house. His description of the fire to Allstate and ELI clearly implied that the fire had been accidental. He subsequently accepted a payment and signed a document referring to his claim in conjunction with Allstate investigating his report. The defendant's words and conduct clearly implied to Allstate that he considered the fire to be a covered loss under the Policy, i.e., accidental; however, the jury determined that he set the fire knowingly. Thus, the defendant's words and conduct entitled the jury to conclude that the defendant intentionally presented a false or fraudulent claim for the payment of a loss or other benefit upon the Policy.

Accordingly, we conclude that the proof was sufficient to support the jury's conclusion that the defendant violated the false or fraudulent insurance claims statute. The Court of Criminal Appeals committed reversible error in concluding otherwise.

## IV. CONCLUSION

We conclude that the proof was sufficient to support the defendant's conviction of presenting a false or fraudulent insurance claim. Therefore, we reverse the decision of the Court of Criminal Appeals on this point and reinstate the defendant's conviction of presenting a false or fraudulent insurance claim in the amount of $10,000 or more but less than $60,000.

_____
JUSTICE ROGER A. PAGE