IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 6, 2021 Session

**TABITHA GENTRY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 13-02671          James M. Lammey, Judge**

_____

**No. W2020-00637-CCA-R3-PC**
_____

A Shelby County jury convicted the Petitioner, Tabitha Gentry, of theft of property valued over $250,000 and aggravated burglary.  The trial court imposed an effective sentence of twenty years.  On appeal, this court affirmed the judgments.  *See State v. Tabitha Gentry*, No. W2015-01745-CCA-R3-CD, 2016 WL 4264266, at *1 (Tenn. Crim. App., at Jackson, Aug. 12, 2016), *perm. app. granted* (Tenn. Dec. 14, 2016).  On appeal to the Tennessee Supreme Court, the supreme court affirmed.  *State v. Gentry*, 538 S.W.3d 413 (Tenn. 2017).  The Petitioner timely filed a post-conviction petition, alleging that she received the ineffective assistance of counsel.  After multiple hearings, the post-conviction court denied relief, concluding that the Petitioner had not proven that Counsel was deficient or that the Petitioner was prejudiced by Counsel's representation.  On appeal, the Petitioner maintains that she received the ineffective assistance of counsel.  After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Kathryn Derossitt, Memphis, Tennessee, for the appellant, Tabitha Gentry.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

A Shelby County grand jury indicted the Petitioner for theft of property valued at over $250,000 and aggravated burglary. These charges stemmed from the Petitioner's seizure and physical occupation of an East Memphis home valued at more than two million dollars and the filing of documents with the Shelby County Register of Deeds Office purporting to reflect her ownership of the East Memphis property. After a trial, the jury convicted the Petitioner of theft of property valued at over $250,000 and aggravated burglary. The Petitioner appealed her convictions, arguing that Tennessee's theft statute did not encompass theft of real property. This court affirmed the Petitioner's convictions but remanded to the trial court for resentencing. *Gentry*, 2016 WL 4264266, at *1. The Petitioner then filed an application with the Tennessee Supreme Court for permission to appeal, which was granted. *State v. Gentry*, 538 S.W.3d 413 (Tenn. 2017). In its opinion, our supreme court concluded that the Tennessee theft statute applied to theft of real property by occupation, seizure, and the filing of a deed to the property and that the evidence was sufficient to support the Petitioner's convictions. This petition for post-conviction relief followed.

## A. Trial

Our supreme court summarized the facts presented at trial as follows:

On August 26, 2011, Renasant Bank ("Bank") foreclosed on the East Memphis home. Gregory Hadaway, an executive vice president at the Bank, assigned Greg Paule, the person in charge of managing the Bank's foreclosed homes, to prepare the home for sale. The home, situated on a three-and-a-half acre gated property, was described by various witnesses at trial as having seventeen rooms, 10,000 square feet of very nicely finished interior space, two fireplaces, a well-manicured exterior with expensive landscaping and a swimming pool, and a four-car garage. Mr. Paule, acting for the Bank, contracted with a real estate agent, John Dickens, to show the home and find a buyer. By February of 2013, Mr. Dickens had sold the home for $2.4 million dollars and scheduled the closing for later that month. The closing was rescheduled to March 29, 2013, to allow the Bank time to make repairs called for by a home inspection report.

Meanwhile, as the Bank worked to finalize the sale, [the Petitioner] worked to acquire the property without purchasing it. On February 25, 2013, [the Petitioner] filed twelve pages of difficult to decipher documents with the Shelby County Register of Deeds. The first of these documents is a January 14, 2012 letter addressed to the Bank's executives, including the Bank president, Jeff Hudson. The document is an "Affidavit of Fact" and "Cover Letter" for a mailing giving notice of [the Petitioner]'s intentions as

to the East Memphis home, although it is not clear that she ever sent the letter to Mr. Hudson or the other people listed as recipients. [The Petitioner] also filed a document titled "quitclaim deed" that purported to transfer title of the East Memphis home to [the Petitioner], using [the Petitioner]'s alias—Abka Re Bay. Because the documents [the Petitioner] filed were so anomalous, the employee receiving them at the Register's office indexed them under "miscellaneous" in the computer system and linked them with [the Petitioner]'s name, rather than indexing them as a genuine transfer of ownership of the East Memphis home.

By March 4, 2013, [the Petitioner] had entered the East Memphis home without the Bank's consent or knowledge and changed the locks. She had placed a large chain and padlock on the front gate that was positioned across the driveway to the property. She also had posted six signs, advertising "No Trespassing," "Private Property," and "Keep Out" on trees around the property. On at least two of those signs, she hand wrote her name. In addition to the chain, she also placed on the gate a flag for the "Moorish National Republic," apparently with a star in the center like the Moroccan national flag, and a sign stating, "I Abka Re Bay, seize this land" for the "Moorish National Trust."

Mr. Dickens, who regularly checked on properties he was selling, discovered the signs, flag, chain, and padlock when he drove by the East Memphis home on March 4, 2013. Mr. Dickens had not given anyone permission to place the items on the property, and he had not seen them there when he had passed by the property only a couple of days earlier.

Mr. Dickens stopped to investigate and called Mr. Paule to notify him about what was happening at the home. Mr. Paule called his boss at the Bank, Mr. Hadaway, because the house was a large asset on the Bank's books. At Mr. Hadaway's direction, Mr. Paule called the police and drove to the property, where Mr. Dickens was waiting, arriving around 3 p.m. Shortly after Mr. Paule arrived, both he and Mr. Dickens saw a woman briefly leave the house and then run back inside. They saw someone peer from a window and yell something unintelligible as the woman headed towards the house. A few minutes later, they saw two younger people come out of the house for only a few seconds and then jump back inside. At about 4 p.m., the Memphis City police arrived, took pictures of the gate, and made note of the "No Trespassing" signs.

- 3 -

By the time the police had spoken with Mr. Dickens and Mr. Paule and prepared a written report, it was nearly dark, and the police decided not to approach the house at that time because of safety concerns. The officers told Mr. Paule to call the police the next morning to discuss the situation. Mr. Paule spoke with his boss at the Bank and the Memphis City police again the next day and the police suggested that Mr. Paule also call the FBI, which he did. The FBI declined to become involved at that time. Later, Mr. Paule and Mr. Dickens went to the Memphis police station in person. Mr. Dickens had checked on the house again that morning and noticed a white car driving up the driveway to the home. The Bank president, Mr. Hudson, had become interested in the situation and also attended the meeting at the police station where it was decided that the Bank needed to give the occupants of the home twenty-four hours' notice to vacate. Mr. Hudson, Mr. Dickens, and Mr. Paule went to the house and placed a written notice to vacate, signed by Mr. Hudson, on the gate, which read:

> March 5, 2013 (2:30) p.m.
> This is your formal notice to vacate this property . . . within 24 (twenty four) hours from date and time above.
>
> You must have vacated this property by March 6th, 2013 at 2:30 p.m.

The next day, March 6th, Mr. Paule planned to go to the home and have the utilities turned off, but his plans changed after he received information from an attorney for the City of Memphis. Although the record does not contain direct testimony about their conversation, a discussion during [the Petitioner]'s trial between the trial judge and counsel for both parties outside the presence of the jury suggests that Mr. Paule learned from this attorney that [the Petitioner] was under FBI investigation because of threats she had made against the President of the United States. Seemingly as a result of concerns related to those threats, the Shelby County Sheriff's Office became involved and decided to enter the house with a Special Weapons and Tactics ("SWAT") team to arrest [the Petitioner] for the home occupation.

On March 7th, Mr. Paule gave the Shelby County Sheriff's Office plans to the house in preparation for an arrest at the house. Late that night or early the next morning a SWAT team from the Sheriff's Office approached the house and waited by a wall on the back side of the property. As the SWAT team prepared to enter the property, they saw a white car

- 4 -

leave through the front gate and radioed a command post that the car was leaving the house. Sergeant Richard Almond III, with the Sheriff's Office, received the call, followed the white car, pulled it over, and arrested [the Petitioner], pursuant to an arrest warrant, about a quarter mile away from the entrance gate to the house. By the time of [the Petitioner]'s arrest, at least three camera crews for news outlets were reporting from outside the home.

The SWAT team, believing that others were inside the home, entered the property after [the Petitioner] left and attempted to open a door to the house with a key they had received from the realtor. Because [the Petitioner] had changed the locks, they could not gain entry with the key, so the SWAT team used a battering ram to break the door open. Once inside, they discovered the house was empty, so the SWAT team left.

Sergeant Brad Less, with the Sheriff's Office, searched the house pursuant to a warrant on March 7, 2013, and took photographs as he did so. He discovered that interior doors had been tied shut with ropes and belts. He found clothing, food, a few air mattresses, official documents under the name of Tabitha Gentry, and "Moorish sovereign documents" issued to "Abka Re Bay," along with other small personal and miscellaneous items. According to the testimony of Mr. Paule, "there was not a great deal of damage" to the East Memphis home, although the door the SWAT team had battered had to be repaired, locks had to be changed, and the home had to be cleaned. Evidence and testimony at trial showed that the home sold for over $2 million on March 29, 2013, shortly after [the Petitioner]'s occupation of the house, and had been appraised, for county tax purposes, at $2.75 million in 2012 and $3 million in 2013.

[The Petitioner] chose not to testify at trial, at least partly based on her belief that she was "not subject to [the] futile jurisdiction" of the trial court.

*Id.* at 413-19.

## B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief alleging, as relevant to this appeal, that her trial counsel ("Counsel") was ineffective because he failed to formally request discovery from the State, failed to obtain an expert witness on real estate conveyances, failed to adequately cross-examine witnesses, and improperly questioned a

lay witness about adverse possession. At a hearing on the petition, the parties presented the following evidence: Michael Stingle testified as an expert witness in the field of criminal defense that he had reviewed the trial transcripts from the Petitioner's trial to determine whether Counsel "met the community standards for zealous . . . and effective representation." After review, Mr. Stingle believed that Counsel had fallen short of the community standard with respect to the issue of discovery because Counsel failed to request discovery even though the record reflected that discovery was made available to him. Mr. Stingle stated that Counsel did not request discovery at the Petitioner's instruction. Mr. Stingle opined that discovery is not one of the areas where a client has control.

Mr. Stingle testified that in a situation where an attorney finds their client's position "so personally repugnant" that they are unable to zealously advocate for their client, they are required to seek withdrawal from the case. Mr. Stingle explained that review of discovery is an important part of effective preparation for trial, noting that the ABA standards for criminal justice require an attorney to investigate. Mr. Stingle stated that an "uncooperative client" does not alter an attorney's duties to investigate and defend at trial. Mr. Stingle agreed that evidence viewed by the State from one perspective can be used by the defense to help their client. In his opinion, Counsel's decision not to request or review discovery was not a strategic decision and therefore he failed to meet the standard for representation.

On cross-examination, Mr. Stingle agreed that he interacted differently with difficult clients than clients who are more cooperative. He confirmed that, in his opinion, professional representation was preferable to self-representation. Mr. Stingle admitted that he only read the trial transcript; he did not read pre-trial hearing transcripts, email communication between the prosecutor and Counsel, review discovery or the exhibits presented at trial and did not speak with the Petitioner or any of the attorneys involved in the trial. Mr. Stingle agreed that there are circumstances where it is advantageous to "allow a Defendant to believe they are driving the train" in order to better facilitate client communication.

After given the opportunity to review the transcript at the hearing, Mr. Stingle agreed that Counsel never said that he did not review discovery; he only said that he did not request discovery at the Petitioner's instruction.

Gregory Charles Krog, Jr., a Memphis attorney, reviewed the document recorded with the Shelby County Register of Deed under Instrument Number 13024258, Exhibit 16 at the Petitioner's trial, portions of the trial transcript, the supreme court opinion related to this case, and additional records related to the ownership of the property at issue ("Shelby County Residence"). Mr. Krog opined that the documents the Petitioner filed were

inadequate to constitute a valid instrument of conveyance, noting all of the deficiencies in the documents. He testified that because the State requires a transfer of an interest in real estate by means of a document, one cannot have theft of real property "without some effective means of asserting dominion over the particular interest involved." The documents the Petitioner submitted was not a valid instrument of conveyance therefore, in his opinion, the Petitioner's conduct in this case could not be a theft. Mr. Krog stated that the Register's Office should have rejected the documents due to their deficiencies. He asserted that it was "clear from the face" that the Petitioner's documents should not have been filed due to the required elements that were lacking. He said that the statute of fraud was not satisfied in this case.

As it relates to the Petitioner's ineffective assistance claim, Mr. Krog opined that it was "difficult to understand" why Counsel did not place more emphasis on the fact that the documents the Petitioner filed with the Register's Office were a nullity as an argument that the elements of theft were not met. Mr. Krog opined that the Supreme Court opinion for this case "clearly said the recordation is an element of the offense." He maintained that "[f]iling a nullity . . . doesn't effectively communicate intent." He asserted that the State cannot prove an intent to deprive of an interest in a house. According to Mr. Krog, the Petitioner's actions did not affect title or actual ownership of the title so there was no deprivation of that interest. To steal a property, in Mr. Krog's opinion, one must steal an interest in the property not merely occupy the property. To the extent the Petitioner intended to transfer the property, Mr. Krog stated that she failed due to the inept drafting of the documents. Mr. Krog opined that Counsel should have called an expert to testify about the documents and his failure to do so was deficient.

The Petitioner testified that she never told Counsel not to review discovery. The Petitioner recalled that she spoke with Counsel about the case but "nothing in detail." She attributed the absence of discussion about her case to "a lack of effort on [Counsel's] part." She admitted that initially she refused to discuss the case with Counsel but maintained that there were court appearances where she tried to talk with him "but [they] never got anywhere." She agreed that there was "considerable publicity" surrounding her case and that "pretty much the entire details of the case" were accessible through news media.

Counsel testified that he had practiced criminal law for over nineteen years, practiced criminal law in both Tennessee and Arkansas, and was certified by the National Board of Trial Advocacy as a specialist in criminal advocacy. Additionally, Counsel was certified to represent defendants in capital punishment cases. Counsel stated that he had worked on capital cases at trial, on appeal, seeking post-conviction relief, and post-conviction appeal. He estimated that he tried approximately ten to fifteen cases a year and had represented clients in over 200 jury trials during his career. Counsel also served as faculty at the Tennessee Criminal Defense College and Advanced Trial College. Counsel

had been qualified as an expert in the standards of practice for criminal trial lawyers in Tennessee. Based upon his work in the field of criminal law, Counsel received the Bob Ritchie Award for outstanding dedication to the criminal trial practice.

Counsel was appointed to represent the Petitioner and was aware of the case due to the news coverage "that went on for the 36 to 48 hours before . . . a SWAT team . . . g[o]t her out of the house." He said that the Petitioner's actions received more news coverage than "most murder cases" in Shelby County. He described it as "wall to wall [c]overage for a couple of days."

Counsel explained that, based upon the Petitioner's filings, he believed she ascribed to a Black Moorish nationalism "strain." This group believed that "the Moorish owned all of the land at one time and were either ejected from it or were pushed off of it. . . . So, they have superior rights to property over anyone else regardless of whether or not the government has provided a system of deeds." Counsel acquainted himself with this organization in preparation for meeting the Petitioner. Initially, he felt his conversation with the Petitioner went well. At some point, however, the Petitioner determined that by accepting Counsel, who was appointed, she was somehow accepting the government, and she "totally changed." From this point forward, communication with the Petitioner was very difficult.

Counsel testified that normally he believed trial attorneys were to make strategic decisions about a case; however, given the Petitioner's position on government, he believed, in order to facilitate a meaningful working relationship, he needed to acquiesce to some of the Petitioner's requests. The Petitioner kept trying to fire Counsel, but Counsel believed this would occur with any attorney given the Petitioner's beliefs about the government. Counsel assisted the Petitioner in seeking to represent herself, and the Petitioner became counsel of record. Near the time of trial, however, the Petitioner became "so combative" with the trial court that the trial court ordered a competency evaluation that the Petitioner refused. Counsel said that, in his opinion, the Petitioner did not have an inability to communicate but an unwillingness. At some point, Counsel was again appointed to represent the Petitioner.

During the time the Petitioner was representing herself, Counsel explained to Petitioner that all decisions were hers, however, as elbow counsel, she should have him do "the ministerial work" such as file motions and file or serve subpoenas. He offered to file a Rule 16 motion for discovery and obtain the record for her. Counsel said that, "she told me flat out, don't do that. I don't want it. I don't want anything from the State." Because she was representing herself at this point, Counsel could not file the motion. By the time the Petitioner forfeited her right to represent herself, the trial date was imminent. He agreed that, prior to trial, the prosecutor provided documents related to the case via email. He said

that the certified copies of the documents the Petitioner filed were all available on line for download.  Even while Counsel served as elbow counsel, the prosecutor "ke[pt him] in the loop" in the event Counsel had to "step in" during the trial.

Counsel testified that, in his opinion, a person could not steal a house because one cannot transfer the actual ownership interest.  He stated that the only way to take property is through the title or deed; thus, he had argued to the jury that one "cannot steal what you cannot take."  About the discovery, Counsel testified that he never said he had not reviewed the discovery, he said that he did not file a Rule 16 request for discovery consistent with the Petitioner's instruction.  Counsel testified:

> I absolutely complied with [the Petitioner's request not to file a Rule 16 motion for discovery] because that's what my client asked even though I didn't have to.  But at the time that I went into trial I absolutely knew everything about the case and nothing was a surprise to me in the case.

Counsel testified about his decision not to hire an expert on real estate transactions.  First, because the Petitioner represented herself, even if he had requested funds for an expert, he would have been able to do very little in the way of preparation.  Secondly, he did not believe expert testimony would have affected the verdict in the case.  Further, the issue of real estate transactions would have further illuminated the Petitioner's relationship with the Moorish nationalism.  Counsel believed that juries are often a "little scared" of people who are different than them and emphasis on Moorish nationalism could cause the jury to view the Petitioner as less relatable.  He stated:

> It's one thing to say somebody is poor and they just are a squatter in the house.  That's something somebody could really look at and have an emotional response to and say, that I'm not convicting her of theft.  She was there five days.  She didn't do any damage.  She didn't steal that house.  That's preposterous. . . . Mom with kids.  The kids were there.  SWAT team was just overblown.

Counsel also noted some negative press around the time of the trial about sovereign citizens and his concern that might weigh against the Petitioner.  He explained that it would be difficult to build sympathy with the jury using real estate law because "It's complex and full of archaic terms."  Counsel stated that his decision to not use an expert was a strategic decision.

Counsel testified that filing a motion for discovery was not the only way to get discovery.  He identified an email containing seven certified assessor documents that were admitted at trial as documents that the State had sent to him before trial.  He testified that

he watched all the news coverage at the time of the events, which included the photographs used at trial. Counsel testified that he viewed a map of the residence on Google that was used at trial and visited the scene in preparation for trial. With regard to the discovery Counsel stated, "I know of nothing that I missed. I know of nothing that was not known [to me]. I know of nothing that was exculpatory that wasn't turned over to me." He explained that his strategy allowed him to still review discovery but also allowed him to benefit from not filing a formal discovery motion to establish some level of rapport with the Petitioner.

On cross-examination, Counsel testified that, prior to trial, he spoke with a real estate attorney who was an authority on "evictions and property in Shelby County." In his discussion with the real estate attorney, the real estate attorney stated that he could not provide testimony that would benefit the defense. Counsel agreed that he raised the issue of adverse possession in opening argument. Although he did not call an expert witness to testify about adverse possession, he noted that he raised the issue of adverse possession through the State's witness, John Dickens, the real estate agent for the East Memphis property. He recalled that he questioned Mr. Dickens about adverse possession to the extent the court allowed it. He stated that the trial court allowed some questioning but ultimately determined that adverse possession was a civil legal theory that would confuse the jury in a criminal trial.

Upon further questioning by the post-conviction court, Counsel testified that if he had attempted to raise legal arguments about the status of the property and whether the documents the Petitioner filed were valid instruments, the trial court would have ruled that the issues were not relevant to the issue at trial. Counsel believed that such evidence would have "mudd[ied] the waters," but he did not believe the trial court "would have let me get too far with it."

After hearing the evidence, the post-conviction court made the following findings:

> Counsel was not deficient in not calling as an expert witness someone qualified as such in civil/real estate law. Much of what is alleged to be ineffective was the subject of the ruling of the Tennessee Supreme Court. Furthermore, counsel was not deficient for not requesting formal discovery, to adhere to petitioner's desires. That decision was an effort to build rapport with petitioner. Counsel was satisfied, as well as this court is satisfied, that counsel was able to gather all the necessary information by other means in order to mount a viable defense.

- 10 -

[I]t appears to the court that the Petitioner was the architect of her own demise. Petitioner's absolute refusal to cooperate with counsel, and hostility towards him caused all of the present assertions of ineffectiveness.

As such, Petitioner has failed to carry her burden of proof as to either deficient performance or prejudice.

It is from this judgment that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner maintains that Counsel was ineffective because he: (1) failed to formally request discovery from the State; (2) failed to obtain an expert witness on real estate conveyances; (3) failed to adequately cross-examine Renasant Bank witnesses; and (4) improperly questioned a lay witness about adverse possession. The State responds that the Petitioner has not met her burden of proving the alleged deficiencies by clear and convincing evidence or that she was prejudiced by Counsel's representation; therefore, the post-conviction court properly denied relief. We agree with the State.

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id*.; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed *de novo* with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn.Crim.App.1997) (stating that the

same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn.1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

In her brief, the Petitioner asserts that this case warrants the application of the *Cronic* standard rather than *Strickland*. We do not agree. Though uncommon, in certain instances, a different standard is employed in reviewing an ineffective assistance of counsel claim. In *United States v. Cronic*, the Supreme Court indicated that there may be exceptional circumstances "that are so likely to prejudice the accused" that a violation of the Sixth Amendment right to counsel can be presumed. 466 U.S. 648, 658 (1984). The presumption of prejudice under *Cronic* presents "a narrow exception to *Strickland*'s holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense." *Florida v. Nixon*, 543 U.S. 175, 190 (2004). While *Strickland* applies to most "cases involving mere attorney error," *Cronic* applies to those cases in which there has been an actual or constructive denial of counsel. *Roe v. Flores-Ortega*,

528 U.S. 470, 482-83 (2000) (internal quotation omitted); *see Strickland*, 466 U.S. at 692 ("Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice.").

In *Cronic*, the United States Supreme Court described three situations in which prejudice should be presumed. Those circumstances include: (1) "the complete denial of counsel"; (2) when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) when circumstances are such that "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id*. at 659-60. In these instances, the process is presumptively unreliable and proof of actual prejudice is not required.

In order to establish the constructive denial of counsel, a petitioner must show that "although counsel [was] present, the performance of counsel [was] so inadequate that, in effect, no assistance of counsel [was] provided" at all. *Cronic*, 466 U.S. at 654 n.11. The United States Supreme Court has clarified counsel's "failure to test the prosecutor's case . . . must be complete" and must have occurred "throughout the . . . proceeding as a whole" rather than "at specific points." *Bell v. Cone*, 535 U.S. 685, 697 (2002). In *Cronic* itself, the United States Supreme Court held that prejudice could not be presumed based simply on counsel's lack of experience and short amount of time to prepare for trial. 466 U.S. at 663-66 (remanded for reconsideration under *Strickland* standard). Additionally, an allegation that counsel failed "to investigate and pursue all avenues of defense" has been considered more appropriately analyzed under *Strickland* "rather than as a fundamental breakdown of the adversarial process such that prejudice is presumed under *Cronic*." *Chadwick v. Green*, 740 F.2d 897, 901 (11th Cir. 1984); *see also Woodard v. Collins*, 898 F.2d 1027, 1029 (5th Cir. 1990) ("[A] decision to investigate some issues and not others or even a decision to conduct virtually no investigation is governed by *Strickland* and its progeny."). Thus, Petitioner has the burden of overcoming the "strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions." *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015).

The Petitioner's allegations of Counsel's supposed failures are not so complete and so egregious that the Petitioner was functionally without counsel during the trial. Accordingly, we review the Petitioner's allegations under the *Strickland* analysis.

### A. Failure to File a Rule 16 Motion for Discovery

The Petitioner contends that Counsel was ineffective when he failed to file a Rule 16 motion requesting discovery from the State. Rule 16(a)(1)(C) of the Tennessee Rules of Criminal Procedure provides that

- 13 -

[u]pon request of the defendant, the [S]tate shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the [S]tate, and which are material to the preparation of the defendant's defense or are intended for use by the [S]tate as evidence in chief at the trial, or were obtained from or belong to the defendant.

The Petitioner asserts that Counsel was ineffective because he failed to request discovery pursuant to Tennessee Rule of Criminal Procedure 16. We agree that Counsel had a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter*, 523 S.W.2d at 933. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691; *see also State v. Burns*, 6 S.W.3d 453, 462 (Tenn.1999). However, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

The evidence does not preponderate against the post-conviction court's findings on this issue, which were that Counsel's decision not to formally file a request for discovery was "an effort to build rapport with petitioner" and that Counsel gathered "all the necessary information by other means in order to mount a viable defense." Counsel testified that the Petitioner was adamant that he not formally request discovery because it contradicted her beliefs. In an effort to deal with a client, who wanted to remain independent based upon her beliefs, Counsel complied with her requests where he believed he could do so and not compromise her defense. Although Counsel did not formally request discovery, we note that Counsel visited the crime scene, reviewed documents from the Shelby County Register of Deeds, viewed aerial views of the property on Google maps, spoke with an attorney knowledgeable about real estate law, and viewed prospective exhibits the State sent him prior to trial. Counsel testified that he knew "absolutely [ ] everything about the case and nothing was a surprise to [him]" at trial.

We conclude therefore, that the Petitioner failed to demonstrate that Counsel's services fell outside the range of competence normally required of attorneys in criminal trials. *See Baxter*, 523 S.W.2d at 936. Furthermore, the Petitioner does not offer any information withheld from Counsel that would have changed the outcome of the trial and, thus, fails to demonstrate how Counsel's conduct prejudiced her. *Strickland*, 466 U.S. at

- 14 -

694. Having failed to demonstrate either prong of the *Strickland* standard, the Petitioner has not met her burden of showing she is entitled to post-conviction relief based upon Counsel's performance. *Id*. She is not entitled to relief on this issue.

### B. Failure to Hire an Expert Witness

The Petitioner asserts that Counsel's failure to hire an expert witness to challenge the validity of the documents the Petitioner filed with the Shelby County Register of Deeds constitutes deficient performance. The Petitioner claims that the supreme court opinion in this case indicated the supreme court was "unaware that the document was a total 'nullity,' 'frivolous,' 'largely incoherent,' 'delusional,' and did not have any technical requirements for real estate transfers and would not qualify as a forgery or crime against Renasant Bank in any way." In addition to what she contends is our supreme court's lack of understanding of the case, she argues that Counsel's failure to educate the jury on the invalidity of these documents was deficient. The State responds that Counsel made a strategic decision not to hire an expert witness and this decision did not prejudice the Petitioner. We agree with the State.

In its oral ruling following the hearing, the post-conviction court stated that, had Counsel sought to present an expert in real estate law to explain the doctrine of adverse possession to the jury, it would not have allowed an expert to testify about adverse possession because it was a civil matter. The post-conviction court concluded that the civil legal doctrine of adverse possession was "totally irrelevant to whether or not the State could prove their case of theft." The post-conviction court noted that Renasant Bank may have had civil remedies to the situation but that the civil remedies to the Petitioner's occupation of their property was not at issue at the criminal trial of the matter.

In this case, the State was required to prove that the Petitioner: (1) knowingly obtained or exercised control over the East Memphis property, (2) "with intent to deprive the owner" of the property, and (3) without Renasant Bank's effective consent. T.C.A. § 39-14-103 (2010). The State had to show the Petitioner's intent to deprive Renasant Bank of the property, not a valid conveyance of a property interest. As we noted in our analysis on direct appeal, the Petitioner's entry to the property without permission, barred the entry of the lawful owner, and her act of placing signage around the property indicated her intent to deprive the rightful owner of the property. *Tabitha Gentry*, 2016 WL 4264266, at *6. Our supreme court further noted that the documents expressly stating the Petitioner's intent to possess the property also demonstrated her intent to deprive Renasant Bank of the property in support of the jury's conviction for theft. *Gentry*, 538 S.W.3d at 427. Because the criminal statute requires only that the State prove that the Petitioner intended to deprive the Bank of possession, not that she actually divested the property interest, an expert on

- 15 -

adverse possession is not relevant to the issue of intent as it relates to the theft statute; therefore, we cannot conclude that Counsel was deficient in this respect.

Moreover, Counsel testified that he considered hiring an expert witness but due to the tenuous and uncertain nature of his representation, he declined to do so because he could not direct or communicate with the expert while the Petitioner acted *pro se*. Counsel testified that he spoke with an expert witness, and the expert indicated that he could not provide any testimony that would benefit the defense. This court is to give deference to matters of strategy and tactical choices when the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369). In our view, Counsel reasonably decided against hiring an expert witness based upon the specific facts and nuances of this case.

Accordingly, we conclude that the post-conviction court properly declined to grant relief on this issue. The Petitioner is not entitled to relief as to this issue.

### C. Cross-Examination of Renasant Bank Witnesses

The Petitioner asserts that Counsel failed to adequately interview witnesses "from Renasant Bank prior to trial." Her argument, however, does not address this assertion. The argument in Petitioner's brief asserts that Counsel failed to "cross examine witnesses from Renasant Bank as to whether or not Renasant Bank had a house stolen from them." The brief then summarizes testimony from Greg Hadaway, Renasant Bank Executive Vice President and Regional Senior Credit Officer, at trial. A petitioner should present at the post-conviction hearing any witness he contends trial counsel failed to cross-examine in support of his defense. *See Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). Mr. Hadaway did not testify at the post-conviction hearing, therefore, the Petitioner has failed to establish her claim as to Mr. Hadaway by clear and convincing evidence.

The Petitioner did submit an affidavit from Greg Paule, a Renasant Bank Real Estate Sales Officer. As relevant to the Petitioner's argument, the affidavit contained the following question and Mr. Paule's answer:

Did you report to law enforcement that there was a theft of Property from your place of employment, - specifically theft of a piece of real estate – related to this unusual event?

I did not use the terminology of "theft." I told them that there were people living in our Bank's property and it looked like they intended to stay.

- 16 -

The Petitioner asserts that Counsel failed to adequately cross-examine Mr. Paule at trial because he failed to ask Mr. Paule if he considered the house at issue "stolen."

Lay witnesses may give testimony in the form of an opinion where the testimony is "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." T.R.E. 701(a). The testimony is not objectionable merely because it embraces an ultimate issue before the jury. T.R.E. 704. However, the admission of lay opinion testimony is limited to those situations wherein the jury could not readily draw its own conclusions on the ultimate issue, without the aid of the witness's opinion testimony. *Blackburn v. Murphy*, 737 S.W.2d 529, 533 (Tenn. 987). Where "'the subject of [a non-expert's] inference [from the facts is] well within the range of common knowledge,' then a question calling for a conclusion of a lay witness or an answer offering an opinion of a lay witness on an ultimate issue is generally improper." *Id.* at 532 (quoting *Nat'l Life & Accident Ins. Co. v. Follett*, 80 S.W.2d 92, 98 (1935)). When the admission or exclusion of opinion evidence is challenged on appeal, it is reviewable only for abuse of discretion. *See, e.g., State v. Gray*, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997).

The question of whether or not the Petitioner committed theft under the facts presented by the State was the jury's role in this trial. Therefore, it is unlikely that the trial court would have allowed such questioning from a lay witness on an ultimate issue, and the Petitioner has not shown otherwise. Accordingly, the Petitioner has failed to meet her burden of proving this allegation by clear and convincing evidence. She is not entitled to relief.

### D. Cross-examination of Mr. Dickens

The Petitioner asserts that Counsel's cross-examination of Mr. Dickens about his knowledge of adverse possession was deficient because Mr. Dickens was never qualified as an expert witness. She further argues that Counsel failed to make an offer of proof once the trial court limited the cross-examination of Mr. Dickens. The State responds that Counsel's decision to question Mr. Dickens about adverse possession was strategic and reasonable.

At trial, Counsel asked Mr. Dickens, the real estate agent for the East Memphis property, about adverse possession. On redirect examination, the State also questioned Mr. Dickens about adverse possession and Mr. Dickens stated that he believed that adverse possession was not a defense to theft of property. The trial court then limited Counsel's cross-examination of Mr. Dickens about adverse possession due to the possibility of confusing the jury on a complex civil legal issue. Counsel was, however, allowed to ask whether Mr. Dickens actually knew whether adverse possession was a defense to theft, and

- 17 -

Mr. Dickens responded that he did not know for certain. Counsel did not request to make an offer of proof outside the presence of a jury.

This court has previously held that a petitioner is not entitled to, with the benefit of hindsight, second-guess an attorney's reasonably based trial strategy and criticize a sound but unsuccessful tactic. *Dellinger v. State*, 279 S.W.3d 282, 295 (Tenn. 2009) (citing *Thompson v. State*, 958 S.W.2d 156, 162 (Tenn. Crim. App. 1997).

Based upon our review of the trial record, we conclude that the Petitioner has failed to demonstrate that Counsel was ineffective in his cross-examination of Mr. Dickens. It appears that Counsel conducted a competent cross-examination of Mr. Dickens at trial. Although the Petitioner now complains that Counsel should not have questioned Mr. Dickens about adverse possession, we note that "cross-examination is a strategic and tactical decision of trial counsel which is not to be measured by hindsight," *State v. Kerley*, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991), and "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." *Taylor v. State*, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). Having reviewed the trial record, we agree with the post-conviction court concerning this issue. We conclude that Counsel conducted an effective cross-examination of Mr. Dickens and strategically introduced the concept of adverse possession in support of the affirmative defense of claim of right. Furthermore, even assuming Counsel's performance with regard to his cross-examination of Mr. Dickens was ineffective, the Petitioner has failed to demonstrate prejudice resulting from her attorney's performance. The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

- 18 -