IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2024

**STATE OF TENNESSEE v. GEORGE CLEAVE[1]**

**Appeal from the Circuit Court for Fayette County**
**No. 22-CR-138      J. Weber McCraw, Judge**

_____

**No. W2023-01590-CCA-R3-CD**

_____

Defendant, George Cleave, was convicted by a jury of theft over $1,000, but less than $2,500, a Class E felony. Following a hearing, the trial court sentenced Defendant as a Range I offender to two years, suspended to supervised probation with credit for time served and ordered Defendant to pay $2,500 in restitution. On appeal, Defendant contends the evidence is insufficient to support his theft conviction and that the trial court abused its discretion in determining the restitution amount because it was unsupported by any proof. Upon review of the entire record, the briefs of the parties and the applicable law, we affirm Defendant's conviction but reverse the judgment of the trial court in part and remand for a new restitution hearing consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Reversed and Remanded in Part**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Raven Prean-Morris, Assistant Public Defender – Appellate Division, Franklin, Tennessee (on appeal); Matthew C. Edwards and Kari I. Weber, Assistant District Public Defenders, Somerville, Tennessee (at trial) for the appellant, George Cleave.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; Mark E. Davidson, District Attorney General; and Falen Chandler, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] Defendant's last name is spelled both "Cleave" and "Cleaves" throughout the record and Defendant did not specify the spelling of his name at trial. Consistent with this court's policy, we use the spelling of his last name as it appears in the indictment.

# OPINION

## Factual and Procedural Background

This case arose when Defendant stole a "sock full" of money belonging to John Washington from Mr. Washington's truck. Defendant was among a group of people who interacted with the victim on the day of the theft. The police were called three days later when Defendant and the victim were fighting after the victim accused Defendant of taking his money. Subsequently, the Fayette County Grand Jury indicted Defendant of theft valued at $10,000 or more, but under $60,000.

The victim was a resident of Gallaway in Fayette County and was in the business of purchasing pallets, restoring them, and selling them for a profit to businesses in town and in Shelby County. He explained that he kept cash on him to purchase the pallets. The victim testified that he counted his money every morning before setting out. Because he feared losing his money, he stored it in a black sock which he kept in his back pocket.

On the morning of September 23, 2022, Defendant counted $13,000, in cash before he, his nephew, Chris Jones, and another relative, Saul Washington[2] set out for the day to sell the pallets. After they finished working for the day, they went to a liquor store in Arlington. Instead of keeping the sock in his back pocket, the victim placed the sock next to him on the seat of his truck. He gave Saul $20 from his sock to go in the store to purchase drinks. The men then returned to the victim's apartment where they were met by "a whole lot of folks," including a man named George, later identified as Defendant, who clamored and piled into his truck. The victim did not know George's last name. Defendant said that the victim had a flat tire on his trailer, so the victim stepped out of the truck to look. The victim testified that his sock was still on the seat in his truck but that he had locked the truck. Saul and Mr. Jones had already left. The victim testified that Defendant got into his truck and took his money. When asked whether he saw Defendant take the money out of the truck, the victim answered, "Well, I saw him when he got the sock. I tried to catch him but I couldn't catch him." He and his granddaughter ran after Defendant, but they could not catch him.

The victim called the police and he and several of his family members accompanied the police to Defendant's residence. Defendant was in his front yard and denied having taken the victim's money. The victim testified that he saw Defendant three days later with a new truck and that "a white dude" told him that Defendant had purchased the truck with

---

[2] The victim identified Saul Washington as his cousin but also identified Saul as his mother's brother. Saul Washington did not testify at trial. Chris Jones testified at trial that Saul Washington was his cousin. To avoid confusion with the victim, Saul Washington will be referred to by his first name. No disrespect is intended.

the money he stole from the victim. The victim stated that Defendant "never" kept money on him and he accused Defendant of trying "to set [him] up all the time."

During trial when the victim was asked to identify the person he knew as George, the transcript reflects that the victim "look[ed] around" and motioned toward the jury box and stated that George was "on that side over there."[3] The victim said that his eyes were "bad" and that he was not wearing his glasses, and asked that the person he identified as George be brought closer to him so he could get a better look. The victim testified that he had known George two to three years because he occasionally paid George to work on his truck.

On cross-examination, the victim testified that he was counting his money when Defendant told him about the flat tire on his trailer. He said he could get receipts for the pallets he sold on the day of the theft, but he did not have any receipts with him at trial. He testified further that he made $400 to $500 that day and thus he had around $13,400 to $13,500 after he finished hauling and selling the pallets:

Defense counsel: Do you remember what you made that day?

The victim: I made about four or five hundred dollars that day.

Defense counsel: Did you put that in your sock?

The victim: Yeah, but I didn't even count the five hundred. I just counted the thirteen hundred dollar bills, you know. I didn't count the four or five hundred.

Defense counsel: You counted thirty-two (sic) hundred dollar bills?

The victim: Yeah. I count them every day I get up.

Defense counsel: So you had thirteen hundred dollar bills in the sock.

The victim: I mean thirteen thousand, not no thirteen hundred. Thirteen thousand.

Defense counsel: You had a hundred and thirteen thousand; correct?

---

[3] Following the close of the State's case, Defendant moved for a judgment of acquittal. After the trial court denied the motion, defense counsel stated for the record that the victim had identified a juror as Defendant. In arguing against the motion, the State noted that Defendant was wearing a mask during trial.

The victim:          I mean I had thirteen thousand dollars.

Defense counsel:     But once you went . . . and sold the pallets, you would have had somewhere around thirteen thousand, four hundred or five hundred.

The victim:          Right – right – right – right.

On redirect examination, the victim testified that he celebrated his seventy-sixth birthday the Saturday before the trial. He maintained that he had a good memory. He denied seeing any of the other people standing around his truck take his sock from his truck. He testified that he continued to keep his money in a black sock and had it on him during his testimony. The victim testified that Defendant knew the victim stored his money in a black sock because Defendant had seen the victim with the black sock "a hundred times."

Jonathan Christopher Jones, the victim's nephew, testified that he went to work with the victim and his cousin Saul on September 23, 2022. Mr. Jones explained that the three of them picked up pallets in Memphis and the work lasted all day. After work, they stopped at a liquor store next to a gas station in Arlington. Mr. Jones did not recall who entered the liquor store, but noted that because the victim was "older," he typically remained in the truck, so it was more likely that he or Saul went inside. Mr. Jones confirmed that the victim paid for the drinks with money which he "always" kept in a sock. He did not specifically recall seeing the victim with money the day of the theft but agreed that it was "normal" for the victim to keep his money in a sock and he did not recall seeing the victim store his money elsewhere.

After their stop at the liquor store, the three of them drove to the victim's house. Mr. Jones testified that he would ordinarily drive but because he was so tired, Saul drove to the victim's home. Mr. Jones confirmed that there were three people outside waiting for the victim: a man named Brett, "a young man named Josh," and Defendant who Mr. Jones identified as George. Mr. Jones explained that people were "always" waiting for the victim when he came home from work. "They'll need him to do stuff or asking for things or maybe want to do something for him. He pays people, you know, cause he's an older guy, you know, he lets them do a little stuff for him." Mr. Jones testified that usually he or Saul would be the first ones to exit the truck, but both were very tired and moved slowly out of the vehicle that day. The victim was the first to exit the truck. Mr. Jones recalled that the victim did not want to be bothered that day and was annoyed by the people waiting for him. Mr. Jones stood directly behind the truck as the three men who were waiting for the victim huddled around the trailer.

- 4 -

After Mr. Jones got home, he received a call asking him if he had found any money. When he learned how much money was lost, he "rushed back" to the victim's residence and talked with the victim about who had been around the truck and trailer. The victim told Mr. Jones he believed Defendant had taken his money. Mr. Jones thought at that point that the victim had simply lost his money. Mr. Jones acknowledged that he did not see who took the money and he denied taking the money. He also denied that he and the victim had argued that day.

On cross-examination, Mr. Jones denied that Defendant ever worked with him and his family or that Defendant went to the liquor store with them after they had finished their work the day of the incident. Mr. Jones was aware that Defendant did "side work" for the victim.

Mr. Jones was aware that the victim kept his money in a sock and that he usually kept the sock "on him, in his pocket." He had never seen the victim keep the sock on the front seat of the truck. On the day of the theft, Mr. Jones did not see "any money" and he did not know how much was taken until the sock "came up missing." Mr. Jones agreed that the sock had to have been "pretty big" due to the amount of cash that was reported stolen.

James Mayes, the Gallaway Chief of Police, testified that the victim reported an incident of theft involving Defendant on September 23, 2022. Before coming to the police station, the victim had already contacted the dispatcher about the incident and Chief Mayes had another officer go to the scene. The officer did not produce a report nor did the officer accompany the victim in locating Defendant. The victim reported that Defendant had stolen $12,500, which was kept in a sock. The victim filed a physical report and swore to the affidavit.

Two days after the victim gave a statement, while he was in church, Chief Mayes received a call about a disturbance between the victim, his daughter, and Defendant over the money. Chief Mayes left church and drove to the victim's residence where he was met by the victim and his daughter who were "out of control going off about the money[.]" Chief Mayes instructed them to stay in their home as he went to talk to Defendant who lived across the street from the victim.

Chief Mayes went to Defendant's apartment and asked him about the victim's money. Defendant stated that he was at the victim's residence on the day the money went missing but denied that he took the victim's money. When Chief Mayes asked Defendant how much money he had on him, Defendant pulled from his pocket cash which totaled approximately "twelve hundred dollars or so" and a title to a vehicle. Defendant said he found the money in a sock on Highway 70. Defendant told Chief Mayes that the blue

Tahoe in the parking lot belonged to him and that he had purchased it "from a friend down the road." Defendant was not asked how much he paid for the Tahoe or whether he used the money he found in the sock to purchase the Tahoe.

Chief Mayes knew Defendant for "as long" as Chief Mayes had been employed with the Gallaway Police Department and he had "never" seen Defendant with a car in the six years he had known him. Chief Mayes explained that Defendant sometimes washed the patrol cars and was paid $15 to do so. Chief Mayes identified Defendant in the courtroom.

On cross-examination, Chief Mayes clarified that it was not common for an officer not to write a report on an incident of theft. He explained that the officer who was first dispatched to respond to the victim was no longer with the police department at the time of trial.

Chief Mayes testified that Defendant cleaned the outside of the squad cars. He did not clean inside the cars. Chief Mayes stated that he always locked his squad car when it was being washed by Defendant; he trusted Defendant to wash his squad car but not to go inside his car. He added that he would not let anyone wash his squad car "period" if he did not know or trust the person.

Chief Mayes was asked questions about the affidavit of complaint. In it, the victim reported that Defendant had grabbed the sock from underneath the seat, not on the seat. Chief Mayes had attended a prior hearing on the case but did not recall the victim's testifying that the sock was underneath the passenger seat. At that hearing, the victim stated that he had $13,000 in the sock.

Chief Mayes testified that based on "what [he] kn[e]w about [Defendant]," he did not believe Defendant had saved enough money to purchase the Tahoe. He added that Defendant came to him "all the time" for assistance and that Defendant was known to steal and use crack cocaine. He had caught Defendant smoking crack but did not charge him because he wanted to "give [Defendant] a chance." The black sock was never found.

Defendant did not testify. The jury convicted Defendant of theft in the amount of more than $1,000 but less than $2,500.

*Sentencing – April 24, 2023*

At sentencing, the presentence report was admitted without objection. The report made no mention of a requested restitution amount. There was no other proof at the sentencing hearing. The State acknowledged that although the victim testified to a theft of up to $13,500, the jury convicted Defendant of theft of more than $1,000 but less than

$2,500.  The State argued for a two-year sentence with a maximum restitution of $2,500, which was the upper limit of the property-value range of theft for which Defendant was convicted.  The State also requested that the $1,300 seized from Defendant at the time of his arrest be applied toward the total restitution amount.  The State was unopposed to probation given the punishment range of the convicted offense and to permit Defendant to pay the restitution on the remainder of his sentence.

Defendant argued for a sentence in the lower part of the range and took issue with the restitution amount because the $1,300 seized from Defendant "was never traced back to the victim.  It's just assumed that it was his, I guess, by the jury.  So we would ask for the lower range of the sentence."  Other than challenging the victim's ownership of the money found on Defendant at the time of his arrest, defense counsel did not otherwise address the State's request for restitution in the amount of $2,500.

The trial court sentenced Defendant as a Range I offender to two years, suspended with time served.  The trial court then ordered restitution in the amount of $2,500 and asked the State for the location of the $1,300, seized from Defendant at the time of his arrest.  The State confirmed that $1,300 was seized from Defendant and was kept in evidence at the Gallaway Police Department.

Defense counsel then questioned the restitution amount, "I don't understand.  They found [$1,300]."  The trial court added the following remarks:

> They found [$1,300] on him.  He was found guilty of [$1,000 to $2,500].  The victim's testimony varied between [$10,000, $11,000, $12,000].  So the [c]ourt is setting restitution at the top end of that range which I find is consistent with the victim's testimony from what I recollect at trial.

The trial court reiterated that the $1,300 seized from Defendant would be applied to the $2,500 restitution amount.

Defendant filed a timely motion for new trial which the trial court denied.  Defendant thereafter filed a premature notice of appeal.  Tenn. R. App. P. 4(d).  This appeal is properly before the court.

**Analysis**

I.  Sufficiency of the Evidence

Defendant contends the evidence is insufficient to support his conviction because the proof did not establish his identity as the person who took the victim's money from the

victim's truck. He argues that no witnesses observed him actually take the sock out of the truck and points out that the victim identified someone other than Defendant as the perpetrator at trial. He argues further that Mr. Jones and Chief Mayes identified Defendant from their "general familiarity" of him and not because they witnessed Defendant commit the theft.

The State responds that "[a]ffording all reasonable inferences to the State," the proof was sufficient to establish Defendant's identity as the perpetrator of the theft. In his reply brief, Defendant maintains that no rational trier of fact could have found beyond a reasonable doubt that he committed theft because no witness observed Defendant commit a theft and the victim misidentified the perpetrator at trial. We agree with the State.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. "[A] guilty verdict 'removes the presumption of innocence and replaces it with a presumption of guilt.'" *State v. Reynolds*, 635 S.W.3d 893, 914 (Tenn. 2021) (quoting *State v. Gentry*, 538 S.W.3d 413, 420 (Tenn. 2017)); *State v. Allison*, 618 S.W.3d 24, 33 (Tenn. 2021). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *Allison*, 618 S.W.3d at 33; *State v. Jones*, 589 S.W.3d 747, 760 (Tenn. 2019). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *Allison*, 618 S.W.3d at 33-34 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also* Tenn. R. App. P. 13(e).

On appeal, "all reasonable and legitimate inferences from the evidence must be drawn in favor of the prosecution and all countervailing evidence discarded." *State v. Weems*, 619 S.W.3d 208, 221 (Tenn. 2021). As such, this court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017). Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *Allison*, 618 S.W.3d at 34; *Jones*, 589 S.W.3d at 760. "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A theft occurs when a person intentionally deprives an owner of property and knowingly obtains or exercises control over the property without the owner's consent. T.C.A. § 39-14-103(a). Theft of property valued more than $1,000, but less than $2,500, is a Class E felony. *Id.* § 39-14-105(a)(2).

Along with the elements of theft, the State bears the burden of proving the identity of the perpetrator. *State v. Hardison*, 680 S.W.3d 282, 319 (Tenn. Crim. App. 2023). "Identity may be established by circumstantial evidence alone." *State v. Miller*, 638 S.W.3d 136, 158 (Tenn. 2023) (citing *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002)). "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999). "Identity is a question of fact for the jury's determination upon consideration of all competent proof." *Hardison*, 680 S.W.3d at 319 (citing *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005)). Because identity is a question of fact to be resolved by the jury, on appeal, the State is entitled to the strongest legitimate view of the proof of identity. *Id.* "[A] jury's verdict will not be overturned unless there are inaccuracies or inconsistencies that 'are so improbable or unsatisfactory as to create a reasonable doubt of the [defendant's] guilt." *State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003) (citations omitted).

At trial, the victim testified that a man named "George" was among three people who had surrounded his truck when he arrived home. The victim had known George two to three years and George had worked on the victim's truck. The victim testified that he had cash in a black sock which he ordinarily kept in his back pocket, but which he put on the seat of the truck the day it was stolen. Defendant contends that no witness saw him take the victim's sock full of money from the seat of his truck. Viewing the proof in the light most favorable to the State, the victim testified that Defendant told him he had a flat tire on his trailer. When the victim stepped out of his truck to check the tire, Defendant reached in the victim's truck and ran off with the victim's sock of money. The victim and his granddaughter ran after Defendant but could not catch him.

Although the victim had difficulty identifying George at trial, both the victim's nephew, Mr. Jones and Chief Mayes, who were familiar with Defendant, identified him as "George Cleave." Mr. Jones confirmed the victim's testimony that Defendant was among three people waiting for the victim when they returned from selling pallets.

The jury also heard circumstantial evidence of Defendant's culpability. Chief Mayes testified that two days after the theft, after he responded to a disturbance between Defendant and the victim, Defendant was in possession of around $1,300 cash, a title to a vehicle, and a newly purchased vehicle. Chief Mayes testified based on his familiarity with Defendant, he found it unlikely that Defendant could have saved enough money to purchase a vehicle. The jury heard Defendant's explanation that he found the money in a sock on the highway, but clearly did not credit that explanation.

It is the jury's prerogative to accredit or discredit the evidence, and we, as the reviewing court will not invade the jury's province. When viewing the evidence at trial in

the light most favorable to the State, the evidence was legally sufficient to establish Defendant as the man who stole the victim's sock of money and to support his conviction for theft of property over $1,000 but less than $2,500. Defendant is not entitled to relief.

## II. Restitution

Defendant challenges the ordered restitution amount of $2,500 arguing that the amount is not supported by evidence in the record. The State contends the proof fairly reflected that Defendant stole a minimum of $1,300 and that the restitution order was proper because the purpose of restitution is to compensate the victim and to punish and rehabilitate offenders. We conclude that the trial court did not make adequate factual findings to support the victim's pecuniary loss before imposing the restitution.

"[A] criminal restitution order is a final and appealable order under Tennessee Rule of Appellate Procedure 3 when it directs a defendant to pay a set amount of restitution without payment terms." *State v. Cavin*, 671 S.W.3d 520, 534 (Tenn. 2023); *see also State v. Gevedon*, 671 S.W.3d 537, 544 (Tenn. 2023) (holding that a restitution order is a final order under Rule 3 of the Tennessee Rules of Appellate procedure because it resolves all issues in the case, even if it does not include terms of payment). Challenges to restitution are reviewed under an abuse of discretion standard affording a presumption of reasonableness to the trial court's ruling. *Cavin*, 671 S.W.3d at 528 (citing *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012), and *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012)). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *Cavin*, 671 S.W.3d at 528 (quoting *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010)); *see also Gevedon*, 671 S.W.3d at 543.

"The purpose of restitution is not only to compensate the victim but also to punish and rehabilitate the guilty." *State v. Johnson*, 968 S.W.2d 883, 885 (Tenn. Crim. App. 1997); *Cavin*, 671 S.W.3d at 528. Restitution is required for a theft conviction.

> Whenever a felon is convicted of stealing or feloniously taking or receiving property, . . . the jury shall ascertain the value of the property, if not previously restored to the owner, and the court shall, thereupon, order the restitution of the property, and, in case this cannot be done, that the party aggrieved recover the value assessed against the prisoner, for which execution may issue as in other cases.

T.C.A. § 40-20-116(a).

While there is no set formula for determining restitution, the amount must be reasonable. *Cavin*, 671 S.W.3d at 529 (citing *State v. Mathes*, 114 S.W.3d 915, 919 (Tenn. 2003)). "Whenever the court believes that restitution may be proper or the victim of the offense or the district attorney general requests, the court shall order the presentence service officer to include in the presentence report documentation regarding the nature and amount of the victim's pecuniary loss." T.C.A § 40-35-304(b). Restitution must include a determination of the victim's pecuniary loss which includes special damages "as substantiated by evidence in the record or as agreed to by the defendant[.]" *Id*. § 40-35-304(e)(1)(A). Special damages are "'specifically claimed and proved' damages 'that are alleged to have been sustained in the circumstances of a particular wrong.'" *Cavin*, 671 S.W.3d at 528-29 (quoting *Damages*, Black's Law Dictionary (11th ed. 2019)). A victim's pecuniary loss may also include "[r]easonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution of the offense; provided, that the payment of special prosecutors is not considered an out-of-pocket expense[.]" T.C.A § 40-35-304(e)(1)(B).

The burden of proving the victim's pecuniary loss rests with the State. *Cavin*, 671 S.W.3d at 529. To that end, "[a] victim seeking restitution must present sufficient evidence so the trial court can make a reasonable determination as to the amount of the victim's loss." *State v. Bottoms*, 87 S.W.3d 95, 108 (Tenn. Crim. App. 2001). Because the underlying theft occurred after the January 1, 2022 amendment to the restitution statute, trial courts may, but are no longer required, to consider a defendant's financial resources and ability to pay in calculating the restitution amount. T.C.A. § 40-35-304(d) (2022). We recognize that although it may inure to a defendant's benefit to put on evidence of financial means, a defendant does not bear the burden of demonstrating the inability to pay.

Because an order of restitution may be converted to a civil judgment, the burden of proof may not fall below that which is required in a civil suit in order to prevent criminal courts from becoming "a haven for 'victims' who think their losses might not meet the level of proof necessary to recover in a civil case." *Bottoms*, 87 S.W.3d at 108 (quoting *State v. McKinney*, No. 03C01-9309-CR-00307, 1994 WL 592042, at *4 (Tenn. Crim. App. Oct. 26, 1994)).

The statute mandates further that, "[t]he court shall specify at the time of the sentencing hearing the amount and time of payment or other restitution to the victim and may permit payment or performance in installments." T.C.A. § 40-35-304(c). The trial court "may" set a payment schedule but is not required to do so. *Cavin*, 671 S.W.3d at 529 (citing T.C.A. § 40-35-304(c)). Accordingly, should the trial court not impose a payment schedule, the time by which a restitution order must be paid is the expiration of the sentence. T.C.A. § 40-35-304(g)(2).

Here, a remand is required because the trial court abused its discretion when it did not make adequate factual findings in determining the victim's pecuniary loss before setting the amount of restitution. The record shows that Defendant was indicted for theft over $10,000, but less than $60,000, a Class C felony. T.C.A. § 39-14-105(a)(4). At trial, the victim's testimony varied on how much money was stolen from him. At one point, he said he started with $1,300, then later testified consistently that he started with $13,000 in his sock. He also testified that he made $400 or $500 the day the stock was stolen. The jury was instructed that if it found Defendant guilty of theft it must "fix the range of the value of the money" and was given four ranges. Consistent with that instruction, the jury fixed the range at more than $1,000 but less than $2,500, a Class E felony. *Id.* § 39-14-105(c)(2).

While the victim testified at trial, he did not testify at sentencing and the presentence report provided no information on restitution.[4] The agency statement in the presentence report showed that Defendant "was found to have 1300 dollars cash in his possession and the title for a truck that he purchased for cash after the theft." At sentencing, the State offered no proof and argued for restitution in the amount of $2,500, the maximum value assigned by the jury in the verdict. Defendant argued that the $1,300 seized from Defendant was not "traced" to the victim but advanced no argument for a specific figure or offer proof of his financial resources and ability to pay. After the trial court ordered restitution in the amount of $2,500, Defendant argued that the $1,300 seized from Defendant was sufficient to fulfill the restitution requirement. In determining restitution, the trial court recalled the victim's testimony supporting a loss up to $13,000, and imposed a restitution amount of $2,500, at the "top end of th[e] range" and within the jury's finding on the range of the value of the theft. *See White*, 2004 WL 2326708, at *23 (holding "in theft cases not involving restitution as a condition of probation, section 40-20-116(a) restitution may not exceed either the value assessed by the jury or the theft-value range reflected in the jury's verdict"). The trial court also ordered that the seized amount of $1,300 be applied to the total restitution amount.

The trial court here did not engage in the required statutory analysis in determining the victim's pecuniary loss to set the restitution amount. We recognize that a trial court's findings on restitution do not need to be exacting or "equal or mirror the victim's precise pecuniary loss" for a reviewing court to conduct meaningful appellate review. *Mathes*, 114 S.W.3d at 919 (quoting *State v. Smith*, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994)). However, the trial court's need to make findings in this case is crucial given that some proof at trial showed a greater loss, but the jury returned a verdict on a lesser value of the theft. *See White*, 2004 WL 2326708, at *23 (remanding the restitution issue for appropriate

---

[4] Defendant does not challenge the lack of documentation of the victim's pecuniary loss in the presentence report.

findings where the trial court ordered $124,000 in restitution to two defendants who were convicted of the lesser included theft not exceeding $60,000 and facilitation of theft in the same amount respectively); *cf. State v. Spencer*, No. W2023-01008-CCA-R3-CD, 2024 WL 4902263, at *9 (Tenn. Crim. App. Nov. 27, 2024) (affirming restitution order of $971 where trial court considered the defendant's testimony at sentencing on his ability to pay as required at the time of the offenses and where the State relied solely on the proof at trial that defendant had stolen $971 from a Dollar General Store for its request for restitution), *no perm. app. yet filed.*

Moreover, there must exist sufficient proof to establish the victim's loss with some reliability. The sole proof of the victim's pecuniary loss was the victim's trial testimony. There was no information in the presentence report regarding restitution but there was a report that $1,300 was seized from Defendant. T.C.A. § 40-35-304(b). Because no evidence of pecuniary loss was presented other than the victim's trial testimony, any finding of pecuniary loss in this case must necessarily include the trial court's finding on the victim's credibility in ordering restitution. *State v. Haynes*, No. M2022-00822-CCA-R3-CD, 2023 WL 4947926, at *6 (Tenn. Crim. App. Aug. 3, 2023) (reversing restitution order and remanding with instructions for the trial court to "explain which credible evidence it relied upon to determine the victim's pecuniary loss, if any" where the only evidence of victim's pecuniary loss was the victim's testimony at the restitution hearing), *no perm. app. filed.*

Because the trial court is in the best position to determine the credibility of witnesses, we conclude that a remand is necessary for the trial court to make findings which comply with section 40-35-304. "When the trial court has seen the witnesses and heard the testimony, especially where issues of credibility and the weight of testimony are involved, the court on appeal must extend considerable deference to the trial court's factual findings." *McCarver v. Ins. Co. of State of Pennsylvania*, 208 S.W.3d 380, 387 (Tenn. 2006). Accordingly, we reverse the trial court's order of restitution and remand for the trial court to make findings regarding the victim's pecuniary loss and the restitution amount.

## CONCLUSION

Defendant's conviction of theft over $1,000, but not exceeding $2,500, is affirmed but the restitution order is reversed, and the case is remanded for the trial court to make findings consistent with this opinion.

s/ *Jill Bartee Ayers*

JILL BARTEE AYERS, JUDGE

- 13 -